UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| **Global Enterprise Solutions LLC,** | Civil Action No. |
| Plaintiff; | |
| v. | |
| **Vanguard Energy LLC, Maverick Terminals Brownsville LLC, and Matthew Klann,** | |
| Defendants. | Jury Demand |

**Defendants' Notice of Removal**

Defendants Vanguard Energy LLC ("Vanguard") and Matthew Klann (collectively, "Defendants") present this Notice of Removal of the suit brought by Plaintiff Global Enterprise Solutions LLC ("Plaintiff") from the 404th Judicial District Court of Cameron County, Texas, where the suit was instituted, to this United States District Court for the Southern District of Texas, Brownsville Division under 28 U.S.C. §§ 1332, 1441, and 1446. Expressly reserving all questions other than that of removal, Defendants respectfully show that removal is proper as follows:

**State Court Suit**

On June 1, 2021, Plaintiff filed an action in the 404th Judicial District Court of Cameron County, Texas, titled "*Global Enterprise Solutions LLC v. Vanguard Energy LLC, Maverick Terminals Brownsville LLC, and Matthew Klann*" and bearing Cause No. 2021-DCL-04900 (the "State Court Suit").

Defendants Vanguard Energy LLC and Matthew Klann were made aware of this suit on June 7, 2021. Exhibit B-1, *Affidavit of Matthew Klann* at ¶ 5, ¶ 6. Therefore, this Notice of Removal is timely filed by Defendants. 28 U.S.C. § 1446(b).

As of the time of filing of this Notice of Removal, Defendant Maverick Terminals Brownsville LLC has not been served with process.

The State Court Suit is a civil suit in which Plaintiff claims that Defendants defrauded and/or breached certain alleged duties to Plaintiff thereby causing it to lose over $700,000.00. *Plaintiff's Original Petition*, Exhibit A-1 at 1-4. Although Plaintiff sought a temporary restraining order ("TRO") and an injunction when it first filed its state court Petition, the parties reached an agreement regarding the injunctive relief pursuant to Rule 11 and Plaintiff declined to pursue its application for a TRO order by passing on the hearing. *Notice of Filing of Rule 11 Agreement*, Exhibit A-4; *June 11, 2021*, *Rule 11 Agreement*, Exhibit A-5.

### Parties and Citizenship

Plaintiff is and was a New Jersey Limited Liability Company with its principal place of business in Texas at all times relevant to this lawsuit, including when the State Court Suit was filed and removed. *Plaintiff's Original Petition*, Exhibit A-1 at 1-2.

Defendant Vanguard is a Delaware limited liability company. Vanguard's principal place of business is in Florida. *Plaintiff's Original Petition*, Exhibit A-1 at 1-2; *see also Affidavit of Matthew Klann,* Exhibit B-1, at ¶ 7, ¶ 8.

Defendant Maverick is a Delaware limited liability company. Maverick's principal place of business is in Texas. *Plaintiff's Original Petition*, Exhibit A-1 at 1-2.

Defendant Matthew Klann is an individual who resides in Florida. *Plaintiff's Original Petition*, Exhibit A-1 at 2; *see also Affidavit of Matthew Klann*, Exhibit B-1, at ¶ 9.

## Basis for Removal

Removal is proper because Plaintiff improperly joined Maverick solely to defeat diversity jurisdiction. *See Davidson v. Ga.-Pac., L.L.C.*, 819 F.3d 758, 765 (5th Cir. 2016). Improper joinder may be established by showing: (1) actual fraud in the pleadings or (2) the inability of the plaintiff to establish a cause of action against the non-diverse party in state court. *Cumpian v. Alcoa World Alumina LLC*, 910 F.3d 216, 219 (5th Cir. 2018). To prove the latter, a removing party must demonstrate that "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc).

## Applicable Legal Standard

Federal courts apply the federal pleading standard under Rule 12(b)(6) to a plaintiff's allegations when a defendant removes an action to federal court alleging improper joinder. *Int'l Energy Ventures Mgmt., LLC v. United Energy Grp., Ltd.*, 818 F.3d 193, 207–08 (5th Cir. 2016). Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009); FED. R. CIV. P. 8(a)(2).

To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. While this pleading standard does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly,* 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that the defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 556). Although the Court must accept all factual allegations as true, it is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.* (citing *Twombly,* 550 U.S. at 555).

## Argument and Authorities

There is no reasonable basis to believe that Plaintiff could recover from Maverick in state court on its negligence cause of action because Maverick does not owe Plaintiff a duty of care.

Plaintiff asserts only the following cause of action against Maverick in its state court Petition:

E. NEGLIGENCE (AGAINST MAVERICK)

25. Maverick owed Plaintiff a duty of care with respect to the fuel stored at Maverick. Maverick breached its duty by, without limitation:

a. Failing to have reasonable policies and procedures in place for the reasonable protection of fuel stored at Maverick's terminal;
b. Failing to reasonably monitor fuel stored at Maverick's terminal;
c. Failing to reasonably vet position holders using Maverick's terminal;
d. Failing to reasonably account for inputs and outputs of fuel stored at Maverick's terminal;

e. Failing to reasonably provide security for the fuel stored at Maverick's terminal;

f. Failing to require reasonable documentation before fuel was injected into a particular storage tank; and

g. Failing to act as a reasonable terminal would have acted under the same or similar circumstances.

26. Maverick's breaches proximately caused damage to Plaintiff's property and/or property in which Plaintiff had an interest.

*Pl.'s Original Pet.,* Exhibit A-1 at p. 6.

Texas substantive law governs Plaintiff's negligence claim pursuant to this Court's diversity jurisdiction. *Parham v. Ryder Sys., Inc.,* 593 F. App'x 258, 260 (5th Cir. 2014). Under Texas law, the three essential elements of a negligence action are: (1) the existence of a legal duty; (2) a breach of that duty; and (3) damages proximately caused by that breach. *See, e.g., D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex. 2002).

Plaintiff's Petition is devoid of any facts to support its conclusory allegation that Maverick owes it a legal duty. *See* Pl.'s Original Pet. at pp. 3-4, 6. Plaintiff merely asserts that "Maverick owed Plaintiff a duty of care with respect to the fuel stored at Maverick." *Id.* Plaintiff does not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. Based on Plaintiff's cursory allegation, neither the Court nor Defendants can draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Accordingly, "there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood v. Ill. Cent. R.R. Co.,* 385 F.3d 568, 573 (5th Cir. 2004) (en banc).

Moreover, Plaintiff cannot cure this deficiency by providing additional facts that show that Plaintiff has a potential right of recovery against Maverick. It is clear that

Maverick does not owe Plaintiff a legal duty as a matter of law: On October 5, 2020,

Maverick and Vanguard entered into a Terminaling Services Agreement in which

Maverick and Vanguard disclaimed any duties to third parties. *October 5, 2020*,

*Terminaling Services Agreement* (Between Maverick and Vanguard), Exhibit B-2 (the

"Lease"), a true and correct copy of which is attached hereto. Article 20.4 of the Lease

states:

> 20.4 <u>Successors and Assigns and No Third-Party Beneficiaries.</u> This
> Agreement is for the exclusive benefit of the Parties and no other Person or
> entity will have any right or Claim against any Party under any of the terms
> of it or be entitled to enforce any of the terms and provisions of it against
> any Party.

*Id.* Thus, Plaintiff cannot show that Maverick owes it any contractual or common law

duty, a prerequisite for its recovery against Maverick on its negligence claim.

Because Plaintiff has not and, indeed, cannot state a claim that is plausible on its

face against Maverick, it is improperly joined and its citizenship should not be considered

for purposes of determining whether complete diversity exists. *See Int'l Energy Ventures*

*Mgmt.*, 818 F.3d at 200 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (U.S.

2007)).

Ignoring the presence of Maverick, complete diversity exists between Plaintiff  a

citizen of New Jersey and Texas) and Defendants Vanguard (a citizen of Delaware and

Florida), and Matthew Klann (a citizen of the State of Florida). *See Plaintiff's Original*

*Petition,* Exhibit A-1 at pp. 1-2. Additionally, the amount in controversy between

Plaintiff and Defendants exceeds, exclusive of interest and costs, the sum of $75,000:

Plaintiff contends in the State Court Suit that it seeks an amount over $1,000,000. *Id.* at ¶

7; 28 U.S.C. § 1332(a).

This Court therefore has subject matter jurisdiction of this case based on diversity jurisdiction and removal is proper. 28 U.S.C. § 1332. And, all defendants who have been properly joined and served join in or consent to the removal of this case to federal court. 28 U.S.C. § 1446(b)(2)(A)[1]; *Affidavit of Matthew Klann,* Exhibit B-1.

### Other Matters

Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit is pending is located in this district. 28 U.S.C. § 124(b)(5) (The U.S. District Court for the Southern District of Texas, Brownsville Division embraces Cameron County, Texas).

Along with filing this Notice of Removal, Defendants will promptly notify Plaintiff and file a Notification of Removal, attaching a copy of this Notice of Removal, with the Clerk for the District Court of Cameron County, Texas in accordance with 28 U.S.C. § 1446(d).

Plaintiff made a jury demand in state court. *Pl.'s Original Pet.,* Exhibit A-1; *Docket Sheet*, Exhibit A-2.

As 28 U.S.C. § 1446(a) and L.R. 81 require, Defendants provide a copy of Plaintiff's Original Petition filed in the State Court Suit, any process, and the State Court docket sheet, which references and any signed orders served in the State Court Suit, together with an index of matters being filed, and a list of all counsel of record. These documents are attached as *Exhibit A*.

---

1.   28 U.S.C. § 1441(b) does not bar removal. It is well-settled that co-defendants who are not properly joined or who have not been served need not join in the removal. *See, e.g.*, *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815 (5th Cir. 1993); *Getty Oil Corp. Ins. Co. of N. Am.*, 841 F.2d 1254, 1261 n. 9 (5th Cir. 1988). Because Defendant Maverick is improperly joined and has not been served, it need not consent to removal.

**Conclusion and Prayer**

This case is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter of this case under 28 U.S.C. § 1332. Removal is proper because Plaintiff joined Maverick solely to defeat diversity jurisdiction. Removal of this case is proper under 28 U.S.C. § 1441 and in conformance with 28 U.S.C. § 1446. For these reasons, Vanguard and Matthew Klann remove this case from the District Court of Cameron County, Texas, to this Court and pray that this Court enter such orders and grant such relief as may be necessary to secure such removal.

Respectfully,

**Atlas Hall & Rodriguez LLP**


By: */s/ E. Michael Rodriguez*
E. Michael Rodriguez
State Bar No. 00791553
S. D. Tex. No. 18759
Email: mrodriguez@atlashall.com
Eduardo Roberto Rodriguez
State Bar No. 00000080
S. D. Tex. No. 1944
Email: errodriguez@atlashall.com
Paul T. Serafy
State Bar No. 24095901
*Pro Hac Vice Pending*
Email: pserafy@atlashall.com
222 N. Expressway, Suite 203
Brownsville, Texas 78520
Telephone: (956) 574-9333
Facsimile: (956) 574-9337

**Attorneys for Defendants**
**Vanguard Energy LLC and**
**Matthew Klann**

**Certificate of Service**

I hereby certify that a true and correct copy of Defendants Vanguard Energy LLC's Notice of Removal and all accompanying documents required by LR 81 have been served via certified mail, return receipt requested, on July 7, 2021, upon all counsel of record as follows:

Ernest W. "Butch" Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
Jeremy R. Stone
State Bar No. 24013577
jeremystone@butchboydlawfirm.com
Michael J. Blanchard
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563

**Counsel for Plaintiff**

*/s/ Paul T. Serafy*
Paul T. Serafy
Of Atlas Hall & Rodriguez LLP

**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| **Global Enterprise Solutions LLC,** | Civil Action No. |
| Plaintiff; | |
| v. | |
| **Vanguard Energy LLC, Maverick Terminals Brownsville LLC, and Matthew Klann,** | |
| Defendants. | Jury Demand |

### Index of Matters Filed

1. **Pleadings That Assert Causes of Action and All Answers to Such Pleadings**

   Exhibit A-1   *Plaintiff's Original Petition*

2. **Docket Sheet**

   Exhibit A-2   *Docket Sheet*

3. **List of All Counsel of Record**

   Exhibit A-3   *List of Parties and Respective Counsel of Record*

4. **Other Filings**

   Exhibit A-4   *Plaintiff's Notice of Filing of Rule 11 Agreement*

   Exhibit A-5   *June 11, 2021 Agreement Pursuant to Rule 11 of the Texas Rules of Civil Procedure*

5. **Evidence**

   Exhibit B-1   *Affidavit of Matthew Klann*

   Exhibit B-2   *October 5, 2020 Terminaling Services Agreement*

**Exhibit A-1**

FILED - 6/1/2021 3:04 PM
2021-DCL-03273 / 53979485
LAURA PEREZ-REYES
Cameron County District Clerk
By Monica Hernandez Deputy Clerk

CAUSE NO. 2021-DCL-03273 _____

| | | |
|---|---|---|
| GLOBAL ENTERPRISE SOLUTIONS LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CAMERON COUNTY, TEXAS** |
| | § | |
| **VANGUARD ENERGY LLC,** | § | |
| **MAVERICK TERMINALS** | § | |
| **BROWNSVILLE, LLC, AND** | § | |
| **MATTHEW KLANN** | § | Cameron County - 404th District Court |
| | § | |
| *Defendants.* | § | _____JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, REQUEST FOR DISCLOSURE AND APPLICATION FOR INJUNCTIVE RELIEF

COMES NOW, Global Enterprise Solutions LLC and files its Original Petition, Jury Demand, Request for Disclosure, and Application for Injunctive Relief against Vanguard Energy LLC, Maverick Terminals Brownsville, LLC and Matthew Klann ("Defendants") and would respectfully show the Court the following:

### I.   PARTIES

1.      Plaintiff Global Enterprise Solutions LLC ("GES") is a New Jersey limited liability company doing business in Texas.

2.      Defendant Vanguard Energy LLC ("Vanguard") is a Delaware limited liability company doing business in Texas and has its principal office in Texas.  It may be served through its registered agent, Registered Agents, Inc., 5900 Balcones Dr., Suite 100, Austin, TX 78731.

3.      Defendant Maverick Terminals Brownsville, LLC ("Maverick") is a Delaware limited liability company doing business in and with its principal office in Texas.

1

It may be served through its registered agent, C T Corporation System, 1999 Bryan St.,

Suite 900, Dallas, TX 75201.

4.     Defendant Matthew Klann ("Klann") is an individual.  On information and

belief, Mr. Klann resides in Florida.  He committed torts, fraud, and crimes in Texas and

is therefore subject to jurisdiction in Texas.  He may be served at his place of business, 999

Ponce De Leon Blvd., Coral Gables, FL 33134.

## II.   **JURISDICTION**

5.     The Court has jurisdiction over this matter as the damages in controversy

are within the jurisdictional limits of this Court.

6.     The Court has jurisdiction over Defendants because Defendants' conduct

and/or the events arising from this lawsuit occurred in Cameron County, Texas.

7.     Pursuant to Texas Rule of Civil Procedure 47(c)(3), Plaintiff seeks

monetary relief of over $ $1,000,000 and non-monetary relief.

## III.   **VENUE**

8.     Venue is proper because all or a substantial part of the events or omissions

giving rise to the claim occurred in Cameron County, Texas. Tex. Civ. Prac. & Rem. Code

§ 15.002(a)(1).

9.     Venue is also proper in Cameron County, Texas because this is where at

least one Defendant committed theft of Plaintiff's property.  TEX. CIV. PRAC. & REM. CODE

§ 134.004.

## IV.   **DISCOVERY**

10.    In accordance with the Texas Rules of Civil Procedure, discovery in this

case is intended to be conducted under Level 3.

## V.   <u>FACTS</u>

11.      Plaintiff had an interest in certain fuel products.  Plaintiff refers to all fuel at issue in this lawsuit as "the fuel."   Most of the fuel was moved to Maverick in Brownsville, Cameron County, Texas.

12.      The import, export, and movement of fuel products are highly regulated at the state and federal levels.  The following definitions apply to this case:

> a.  **Terminal**.  An IRS-approved motor fuel storage and distribution facility to which a terminal control number has been assigned, to which motor fuel is supplied by pipeline or marine vessel, and from which motor fuel may be removed at a rack.   34 T.A.C. § 3.441(a)(21).

> b.  **Position holder**.  The person who holds the inventory position in motor fuel in a terminal, as reflected on the records of the terminal operator.  A person holds the inventory position in motor fuel when that person has a contract with the terminal operator for the use of storage facilities and terminaling services for motor fuel at the terminal. The term includes a terminal operator who owns motor fuel in the terminal.  *Id.* at § 3.441(a)(16).

13.      Maverick is the terminal where the fuel was transferred.  Unbeknownst to Plaintiff, Vanguard became a position holder when the fuel was transferred into the Maverick terminal.

14.      Even though it had no written agreement with Plaintiff, Vanguard sold some of the fuel that had been transferred into the Maverick terminal.  Plaintiff requested a full accounting for the fuel.  Vanguard refused to comply.

15.      Plaintiff has lost millions of dollars because of Vanguard's misdeeds.

16.      At all times relevant to this lawsuit, Klann was a principal of Vanguard. Klann was the person who took the action necessary to appropriate the fuel, and the person

who took all actions necessary to sell the fuel when he knew neither he nor Vanguard had title to the fuel.

## VI.   AGENCY AND RESPONDEAT SUPERIOR

17.   A company may only act through its agents.  Klann was the Vanguard agent who committed the wrongful conduct alleged in this Petition.  Vanguard is liable for Klann's conduct under the theory of *respondeat superior*.  Klann is individually liable for his own misconduct.

## VII.   VEIL PIERCING

18.   Klann used Vanguard to commit fraud and deceive the public.  As such, the business entity is disregarded and Klann is personally liable for Vanguard's misconduct.

19.   In the alternative, Vanguard is Klann's alter-ego.  That is, there is insufficient "corporate separateness" between Klann and Vanguard.  This insufficient "separateness" is evidenced by Klann's use of Vanguard to commit theft.

4

## VIII.   CAUSES OF ACTION

**A.    TEXAS THEFT LIABILITY ACT (AGAINST VANGUARD AND KLANN)**

20.    Vanguard and Klann committed theft of the fuel.  That is, Vanguard and Klann unlawfully appropriated property.   TEX. CIV. PRAC. & REM. CODE § 134.002(2). Vanguard and Klann are therefore liable for the actual damages resulting from the theft as well as additional damages provided for under Section 134.005(a)(1) of the Texas Civil Practice & Remedies Code.

**B.    UNJUST ENRICHMENT / DISGORGEMENT (AGAINST VANGUARD AND KLANN)**

21.    Vanguard and Klann were unjustly enriched to the extent of the profits made by them through its theft of the fuel.  Plaintiff is entitled to judgment that Vanguard and Klann be required to disgorge and return those profits to Plaintiff.

**C.    CONVERSION (AGAINST VANGUARD AND KLANN)**

22.    Vanguard and Klann wrongfully exercised dominion and control over Plaintiff's personal property in a manner inconsistent with Plaintiff's exclusive right to said property (the fuel).

23.    As a direct and proximate result of Vanguard's and Klann's conversion, Vanguard and Klann damaged Plaintiff and have been unjustly enriched in the millions of dollars.

**D.    MONEY HAD AND RECEIVED (AGAINST VANGUARD AND KLANN)**

24.    Vanguard and Klann hold money that in equity and good conscience belongs to Plaintiff (the profit Vanguard and Klann made from selling stolen fuel).

**E.**     **NEGLIGENCE (AGAINST MAVERICK)**

25.     Maverick owed Plaintiff a duty of care with respect to the fuel stored at Maverick.  Maverick breached its duty by, without limitation:

     a.   Failing to have reasonable policies and procedures in place for the reasonable protection of fuel stored at Maverick's terminal;

     b.   Failing to reasonably monitor fuel stored at Maverick's terminal;

     c.   Failing to reasonably vet position holders using Maverick's terminal;

     d.   Failing to reasonably account for inputs and outputs of fuel stored at Maverick's terminal;

     e.   Failing to reasonably provide security for the fuel stored at Maverick's terminal;

     f.   Failing to require reasonable documentation before fuel was injected into a particular storage tank; and

     g.   Failing to act as a reasonable terminal would have acted under the same or similar circumstances.

26.     Maverick's breaches proximately caused damage to Plaintiff's property and/or property in which Plaintiff had an interest.

## IX.     APPLICATION FOR INJUNCTIVE RELIEF

27.     As detailed in this Petition, Vanguard sold fuel to which it had no title.  GES has interests in additional fuel Vanguard is asserting control over.

28.     Maverick still has some of the fuel at its terminal.

29.     Plaintiff will suffer probable harm and irreparable harm unless this Court grants injunctive relief.  Specifically, Vanguard's willingness to steal is evidenced by the fact that it has already stolen.  Maverick's conduct evidences a lack of safeguards over the

fuel.  Texas courts routinely grant injunctive relief to prevent an asset from being spent that would otherwise be available to satisfy a judgment.

30.     Plaintiff has no adequate remedy at law.  Without injunctive relief, the fuel may be forever lost to Plaintiff.

31.     Plaintiff therefore asks the Court to issue a Temporary Restraining Order enjoining Defendants from:

       (a)     Destroying or altering any documents related to the fuel.

       (b)     Moving, disposing of, selling, secreting, or otherwise losing the fuel.

       (c)     Destroying or altering any electronic communications referencing the fuel, XD, or GES.

       (d)     Destroying or altering any paper communications referencing the fuel, XD, or GES.

32.     Plaintiff asks the Court to issue the Temporary Restraining Order and order it be continued in force until the date set for hearing on Plaintiff's request that the Temporary Restraining Order be converted to a Temporary Injunction.

33.     Plaintiff asks that on final hearing, the Temporary Injunction be converted to a Permanent Injunction.

## X.    CONDITIONS PRECEDENT

34.     All conditions precedent to bringing the above causes of action have been met or occurred.

## XI.   <u>ALTERNATIVE PLEADINGS</u>

35.     The foregoing facts and theories are pled cumulatively and alternatively, with no election or waiver of rights or remedies.

## XII.   <u>REQUEST FOR DISCLOSURE</u>

36.     Under the Texas Rules of Civil Procedure 194, Plaintiff hereby requests that Defendants disclose, within 50 (fifty) days of service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

## XIII.   <u>TRIAL BY JURY</u>

37.     Plaintiff requests trial by jury and submits appropriate jury fee.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendants be cited to appear and answer, and that the Court provide the following relief:

(a)     that a temporary restraining order be granted;

(b)     that a temporary injunction be granted;

(c)     that after a trial on the merits, a permanent injunction be issued in the scope as set forth above;

(d)     judgment against Defendants for all actual damages sustained by Plaintiff;

(e)     pre-judgment and post-judgment interest at the maximum rate permitted by law;

(f)     costs and reasonable attorney's fees;

(g)     exemplary damages;

(h)     lost profits; and

(g)     such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

8

Respectfully submitted,

BUTCH BOYD LAW FIRM

_____
ERNEST W. "BUTCH" BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
JEREMY R. STONE
State Bar No. 24013577
jeremystone@butchboydlawfirm.com
MICHAEL J. BLANCHARD
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563
ATTORNEYS PLAINTIFF

## Case Information

2021-DCL-03273 | Global Enterprise Solutions, LLC vs. Vanguard Energy, LLC,Matthew Klann,Maverick Terminals Brownsville, LLC

Case Number
2021-DCL-03273
File Date
06/01/2021

Court
404th District Court
Case Type
Civil-Other Civil

Judicial Officer
Adobbati, Ricardo M
Case Status
Pending

## Party

Plaintiff
Global Enterprise Solutions, LLC

Active Attorneys ▾
Lead Attorney
BOYD, ERNEST W
Retained

Attorney
STONE, JEREMY RICHARD
Retained

Attorney
Blanchard, Michael J.
Retained

Defendant
Vanguard Energy, LLC

Address
Registered Agents, Inc
5900 Balcones Dr. Suite 100
Austin TX 78731

Active Attorneys ▾
Lead Attorney
RODRIGUEZ, EDWARD MICHAEL
Retained

Attorney
RODRIGUEZ, EDUARDO R.

Details

Retained

---

Defendant
Klann, Matthew

Address
999 Ponce De Leon Blvd
Coral Gables FL 33134

---

Defendant
Maverick Terminals Brownsville, LLC

Address
CT Corporation System
1999 Bryan St. Suite 900
Dallas TX 75201

---

## Events and Hearings

06/01/2021 Original Petition (OCA) ▾

Comment
Plaintiff's Original Petition, Jury Demand, Request for Disclosure and Application for Injunctive Relief

06/01/2021 Efiled Original Petition Document ▾

Comment
Plaintiff's Original Petition, Jury Demand, Request for Disclosure and Application for Injunctive Relief

06/01/2021 Verification ▾

Comment
Verification for Plaintiff's Original Petition, Jury Demand, and Request For Disclosure and Application for Injunctive Relief

06/01/2021 Cover Letter - Request ▾

Comment
Cover Letter Request

06/02/2021 Jury Fee Paid (OCA)

06/02/2021 Citation Issued

06/02/2021 Citation Issued

06/02/2021 Citation Issued

06/02/2021 Clerks Journal ▾

Comment
Sent citations to Attorney via email as was requested (leraekarn@butchboydlawfirm.com;
mikeblanchard@butchboydlawfirm.com)-M.H.

06/02/2021 Request ▾

Comment
Letter requesting preparation of precepts

06/02/2021 Citation ▾

Unserved

Anticipated Server
Civil Process Server

Anticipated Method
In Person

06/02/2021 Citation ▾

Unserved

Anticipated Server
Civil Process Server

Anticipated Method
In Person

06/02/2021 Citation ▾

Unserved

Anticipated Server
Civil Process Server

Anticipated Method
In Person

06/03/2021 Cover Letter - Request ▾

Comment
Request For Issuance Of Citation And Precept

06/03/2021 E-Filed Order ▾

Proposed Ex Parte Temporary Restraining Order and Order Setting Hearing (Q)

Comment
Ex Parte Temporary Restraining Order And Order Setting Hearing For Temporary Injunctive Relief

06/09/2021 Notice of Appearance ▾

Comment
Notice of Appearance

06/14/2021 Motion Set ▾

Judicial Officer
Adobbati, Ricardo M

Hearing Time
8:30 AM

Result
Passed

Comment
EX PARTE TRO

06/14/2021 Journal Entry ▾

Comment
All interested parties appeared and announced they reached an agreement and will submit a Rule 11 Agreement. Hearing passed. RMA/og

06/14/2021 Rule 11 Agreement ▾

Comment
Plaintiff's Notice Of Filing Of Rule 11 Agreement

# Financial

Global Enterprise Solutions, LLC
    Total Financial Assessment      $441.50

|   | Total Payments and Credits |   |   | $441.50 |
|---|---|---|---|---|
| 6/2/2021 | Transaction Assessment |   |   | $384.50 |
| 6/2/2021 | E-File Electronic Payment | Receipt # 2021-10369 | Global Enterprise Solutions, LLC | ($384.50) |
| 6/3/2021 | Transaction Assessment |   |   | $57.00 |
| 6/3/2021 | E-File Electronic Payment | Receipt # 2021-10528 | Global Enterprise Solutions, LLC | ($57.00) |

## Documents

Proposed Ex Parte Temporary Restraining Order and Order Setting Hearing (Q)

Exhibit
A-3

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| **Global Enterprise Solutions LLC,** | Civil Action No. |
| Plaintiff; | |
| v. | |
| **Vanguard Energy LLC, Maverick Terminals Brownsville LLC, and Matthew Klann,** | |
| Defendants. | Jury Demand |

### List of Counsel of Record

1. **Attorneys for Plaintiff**
   **Global Enterprise Solutions, LLC**

Ernes W. "Butch" Boyd
State Bar No. 00783694
butchboyd@butchboydlawfirm.com

Jeremy R. Stone
State Bar No. 24013577
jeremystone@butchboydlawfirm.com

Michael J. Blanchard
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com

**Butch Boyd Law Firm**
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563

2. **Attorneys for Defendants**
   **Vanguard Energy, LLC**
   **Matthew Klann**

E. Michael Rodriguez
Federal ID No. 18759
State Bar No. 00791553
mrodriguez@atlashall.com

Eduardo R. Rodriguez
Federal ID No. 1944
State Bar No. 00000080
errodriguez@atlashall.com

Paul T. Serafy
State Bar No. 24095901
*Pro Hac Vice Pending*
pserafy@atlashall.com

**Atlas Hall & Rodriguez LLP**
222 N. Expressway, Suite 203
Brownsville, TX 78520

**CAUSE NO. 2021-DCL-03273**

| | | |
|---|---|---|
| **GLOBAL ENTERPRISE SOLUTIONS LLC** | § § § § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § § | |
| **v.** | § § | **CAMERON COUNTY, TEXAS** |
| **VANGUARD ENERGY LLC, MAVERICK TERMINALS BROWNSVILLE, LLC, AND MATTHEW KLANN** | § § § § § | |
| *Defendants.* | § | **404th JUDICIAL DISTRICT** |

<u>**PLAINTIFF'S NOTICE OF FILING OF RULE 11 AGREEMENT**</u>

Plaintiff files the Rule 11 Agreement attached hereto as Exhibit A.

Respectfully submitted,

**BUTCH BOYD LAW FIRM**

_____
ERNEST W. "BUTCH" BOYD
State Bar No. 00783694
butchboyd@butchboydlawfirm.com
JEREMY R. STONE
State Bar No. 24013577
jeremystone@butchboydlawfirm.com
MICHAEL J. BLANCHARD
State Bar No. 24036231
mikeblanchard@butchboydlawfirm.com
2905 Sackett Street
Houston, TX 77098
Phone: (713) 589-8477
Fax:(713) 589-8563

1

## CERTIFICATE OF SERVICE

I hereby certified that a true and correct of the above and foregoing has been forwarded to all counsel of record in accordance with T.R.C.P. by method indicated below on this 14th day of June, 2021.

***Via Email: mrodriguez@atlashall.com***
E. Michael Rodriguez
Atlas, Hall &
Rodriguez, LLP
Eduardo Roberto
Rodriguez 222 N.
Expressway, Suite 203
Brownsville, Texas 78520

_____
MICHAEL J. BLANCHARD



June 11, 2021

*__Via Email: mrodriguez@atlashall.com__*
E. Michael Rodriguez
Atlas, Hall & Rodriguez, LLP
Eduardo Roberto Rodriguez
222 N. Expressway, Suite 203
Brownsville, Texas 78520

RE:   Cause No. 2021-DCL-03273; *Global Enterprise Solutions, LLC v. Vanguard Energy, LLC, et al.* In the 404th Judicial District Court of Cameron County, Texas

Dear Mr. Rodriguez,

Please let this letter serve as an agreement under Texas Rule of Civil Procedure 11 as to the following:

1.  Vanguard represents that all Ultra Low Sulphur Diesel (ULSD) NOM 16 Mexico Spec discharged into Vanguard's Tank at Maverick's Terminal from GES's designated barges (the "Fuel") has all been sold or transferred out of Maverick Terminals in Brownsville.

2.  The Parties agree to preserve all documents, communications, and electronically stored information related to this litigation, including but not limited to the following:

    a.  Documents that show quantities, dates of injection, amounts injected, dates of extraction, amounts of extraction of Fuel stored at Maverick Terminal located in Brownsville, TX for which Vanguard Energy LLC, XD Ventures, LLC, Global Enterprise Solutions LLC, and was a position holder.

    b.  Any and all bills of lading, shipping records, or other documents reflecting Fuel maintained or obtained in regards to GES discharges between March and May 2021 related at Maverick Terminal located in Brownsville, TX, in which Vanguard Energy LLC, XD Ventures, LLC, Global Enterprise Solutions LLC, and/or  was a position holder.

    c.  All documents that show or reflect sale or transfer of the "Fuel."

Vanguard will informally provide the inventory report from March 10, 2021, the date of the first load until May 28, 2021, when the fuel ended. Should the terms set forth above be agreeable, please sign and return to show your client's acceptance in accordance with Texas Rule of Civil Procedure 11.

Sincerely,

_____

Michael J. Blanchard

MJB/lk:ssm
Agreed:


*/s/ E. Michael Rodriguez*
_____

E. Michael Rodriguez
Atlas, Hall & Rodriguez, LLP
Eduardo Roberto Rodriguez
222 N. Expressway, Suite 203
Brownsville, Texas 78520
***Counsel for Vanguard Energy, LLC***

**STATE OF FLORIDA**

MiAMi-DADE **COUNTY**

## AFFIDAVIT OF MATTHEW KLANN

      Before me, the undersigned notary, on this day personally appeared MATTHEW KLANN, the affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

      1.    My name is Matthew Klann.

      2.    I am competent to make this affidavit.

      3.    The facts stated in this affidavit are within my personal knowledge and are true and correct.

      4.    I am the President of Vanguard Energy LLC ("Vanguard"). As part of my responsibilities, I am familiar with the structure of Vanguard.

      5.    Vanguard was made aware of this lawsuit on June 7, 2021.

      6.    I was personally made aware of this lawsuit on June 7, 2021.

      7.    At the time of the filing of this action and at the time of removal, Vanguard was and is a limited liability company formed under the laws of the State of Delaware.

      8.    Vanguard's principal place of business in the State of Florida.

      9.    I reside in the State of Florida.

      10.    I consent to removal of this action to the United States District Court for the Southern District of Texas, Brownsville Division.

_____

Matthew Klann

SWORN TO and SUBSCRIBED before me by Matthew Klann on July 6, 2021.

_____

Notary Public in and for the State of Florida

My Commission expires: 09-23-2023

Notary Public State of Florida
Gustavo G Maltez
My Commission GG 345405
Expires 09/23/2023

*Execution Version*

## TERMINALING SERVICES AGREEMENT
(Dedicated Tank Service)

This Terminaling Services Agreement (this "**Agreement**") is entered into as of the 5th day of October, 2020 (the "**Effective Date**"), by and between Maverick Terminals Brownsville, LLC, a Delaware limited liability company ("**Owner**"), and Vanguard Energy, LLC, a Florida limited liability company ("**Customer**"), each sometimes referred to individually as a "**Party**" and, collectively, as the "**Parties**".

### RECITALS

WHEREAS, Owner, either directly or through one of its wholly owned subsidiaries, is the owner of the Terminal (as defined below); and

WHEREAS, Customer desires to utilize Owner's Terminal for the receipt, storage, terminaling and redelivery of Product (as defined below).

NOW, THEREFORE, in consideration of the premises and the covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms and conditions.

### AGREEMENT

**Section 1.    SERVICES**

1.1    <u>General</u>.  Subject to and conditional upon the performance by Customer of all of its obligations as and when provided in this Agreement, Owner will provide Customer services related to the receipt, storage, and delivery of Customer's Product to and from Customer (or on behalf of Customer) into and out of the Tank at the Terminal, and will provide the facilities reasonably necessary to perform such services, as well as provide such additional services as may be provided under this Agreement and its attachments (each of the foregoing services are collectively, the "**Services**"), for the fees, rates and charges contained in this Agreement. Owner will perform the Services in accordance with the terms and conditions of this Agreement, consistent with Good Industry Practice and in compliance with Applicable Law.

1.2    Terminal.  Owner will provide the Services at the Terminal described below:        *REP*

> Owner's Brownsville Terminal located at ~~16265~~ *14301* RL Ostos Road, Brownsville, Texas 78521

1.3    Tank.  Owner will operate, maintain and provide to Customer exclusive access to or use of the following Tank at the Terminal:

| Tank Number | Working Capacity | Roof Type |
|---|---|---|
| 25-1 | 25,000 bbls | Cone |

1.4     Modes of Receipt and Delivery.  Owner will receive and deliver Product into and out of the Tank using the modes set out below:

| Tank Number | Mode of Receipt Into Tank | Mode of Delivery Out of Tank |
|---|---|---|
| 25-1 | Vessel or Barge | Truck* or Railcar |

*As part of the Services hereunder, Customer will be provided one dedicated truck bay with top loading capability

1.5     Product.

Owner will receive and store the Products set forth below in the Tanks:

| Tank Number | Product |
|---|---|
| 25-1 | Ultra-Low Sulfur Diesel (Export Grade) |

1.6     Additional Services.  Owner shall, upon mutual agreement by the Parties hereto, provide such other services not contemplated herein as requested by Customer at a rate agreed upon by the Parties or at a rate of cost plus ten percent (10%) if no such rate for additional services is agreed upon.

1.7     Hours of Operation.  Owner will provide the Services during the hours set forth below for the Services referenced:

Business Office: 10:00 A.M. to 6:00 P.M. Central time, Monday through Friday

Terminal Operations:

Marine Transfers:  24 hours per day, 7 days per week, 365 days per year

Railcar Loading: 10:00 A.M. to 6:00 P.M., Central time, Monday through Friday

Truck Loading: 10:00 A.M. to 6:00 P.M., Central time, Monday through Friday

Tank to tank Transfers: 10:00 A.M. to 6:00 P.M., Central time, Monday through Friday

Holiday Schedule (Business Office only): Owner observes the following holidays

i.     New Year's Day
ii.    Presidents Day
iii.   Good Friday
iv.    Memorial Day
v.     Independence Day
vi.    Labor Day

2

|      |                           |
|------|---------------------------|
| vii. | Thanksgiving Day          |
| viii.| Day after Thanksgiving Day |
| ix.  | Christmas Day             |

**Section 2.**   FEES.  In consideration of the Services provided to Owner under this Agreement, Customer shall pay to Owner the fees set forth in this Section 2.

2.1   Monthly Throughput Fees.  Each Month following the Commencement Date, Customer shall pay to Owner an amount equal to the Throughput Fee multiplied by the Minimum Monthly Throughput Volume, each as set forth below:

| Throughput Fee: | $0.85 |
|---|---|
| Minimum Monthly Throughput Volume: | 50,000 Barrels |

Throughput Fee, as set forth in this Section 2.1, shall be inclusive of all costs attributable to storage, marine offloading and truck rack loading services. The Minimum Monthly Throughput Volume for any Month in which a Force Majeure event occurs that prevents Owner from performing the Services hereunder shall be proportionately reduced on a pro-rata daily basis based on the length of days in such Month affected by the Force Majeure event.

2.2   Excess Throughput Fees.  Each Month, Customer shall pay to Owner an amount equal to the Excess Throughput Fee, as set forth below, on each Barrel of Throughput during the Month (if any) that is in excess of the Minimum Monthly Throughput Volume:

| Excess Throughput Fee: | $0.50 |
|---|---|

Excess Throughput Fee, as set forth in this Section 2.2, shall be inclusive of all costs attributable to storage, marine offloading and truck rack loading services and shall be inclusive of all lubricity and conductivity additive injections.

2.3   Ancillary Fees.  Customer shall pay to Owner the following fees for the Services described below:

Railcar Loading Fees: $0.65 per Barrel of Throughput loaded onto railcars.

Railcar switching and storage shall be performed by Brownsville Rio Grande International Railroad and reimbursed by Customer to Owner on a cost plus 10% basis.

Port Fees: All fees incurred by Owner in connection with the use of the Port of Brownsville to provide the Services, including, but not limited to, those fees attributable to demurrage, wharfage, dockage, pipeline.

Sampling Fee: $35 per sample taken, packaging and shipping provided at a cost plus 10% basis.

Scale Fee: $10 per truck loaded.

2.4     Other Services.  Customer may request that Owner provide additional services that are outside the scope of the Services, or that Owner provide the Services outside of its normal hours of operation as set forth above.  If Owner agrees to provide such services, then they will be deemed to be part of the Services for all purposes under this Agreement and unless the Parties provide for another charge, Owner will charge Customer the fees set forth below:

> Straight Time: $44.00 per hour per operator (for work outside the scope of Agreement performed during normal working hours).

> Overtime:  $66.00 per hour (for work outside normal working hours or work outside both the scope of the Agreement and normal working hours).

> Holidays:  $90.00 per hour (for work outside normal working hours, if such work occurs during any holiday observed by Owner as set forth in Section 1.7).

A minimum charge of four hours will apply to each instance.

**Section 3.     TERM.**

3.1     Term.  This Agreement is effective as of the Effective Date.  Owner will provide the Services to Customer beginning on the Commencement Date and continuing for three (3) Months following the Commencement Date (the "**First Service Term**").  At the end of the First Service Term, this Agreement shall be automatically extended for successive periods of three (3) Months each (each such period also referred to herein as a "**Renewal Service Term**"), unless earlier terminated by either Party by giving the other Party written notice at least thirty (30) days prior to the end of the First Service Term or the then-current Renewal Service Term, as applicable.   The First Service Term and any Renewal Service Term(s) will be deemed collectively the "**Service Term**."

3.2     Commencement Date.  Owner will provide the Services to Customer beginning on October 30, 2020 (the "**Commencement Date**").

**Section 4.     NOTICE.**  Any notice required under this Agreement must be sent or transmitted by (i) United States mail, certified or registered, return receipt requested, (ii) confirmed overnight courier service, or (iii) confirmed electronic (e-mail) transmission properly transmitted to the address of the Party indicated below or to such other mailing address or e-mail address as one Party shall provide to the other Party in accordance with this provision.  All notices, consents, demands and other communications hereunder are to be in writing and are deemed to have been duly given or made on the delivery date if delivery is made during applicable normal working hours, or on the next Business Day if delivered after applicable normal working hours. In the event a delivery or notice deadline falls on a weekend or holiday, then the applicable deadline will be extended to include the first Business Day following such weekend or holiday.

If to Owner:          Maverick Terminals Brownsville, LLC
                      16211 La Cantera Parkway, Suite 202
                      San Antonio, Texas 78256
                      Attn: General Counsel

                      Telephone: 210-812-5702
                      Email: legal@howardep.com

4

For Owner accounting matters:

        Maverick Terminals Brownsville, LLC
        16211 La Cantera Parkway, Suite 202
        San Antonio, Texas 78256
        Attn: Terminal Accounting
        E-mail: terminalaccounting@howardep.com

If to Customer:        Vanguard Energy, LLC
        999 Ponce De Leon, Suite 510
        Coral Gables, FL 33134
        Attention: Matthew Klann

        Phone: (786) 472-6083

        Email: mklann@vanguardiaenergy.com

**Section 5.**    <u>ADDITIONAL TERMS AND DOCUMENTS.</u>

    5.1    <u>General Terms</u>.  The Howard Midstream Energy Partners, LLC General Terms and Conditions for Terminaling Agreements with Dedicated Tanks Service set forth on <u>Schedule 1</u> are hereby incorporated into this Agreement by this reference.

    5.2    <u>IRS Registration</u>.  Simultaneous with the execution of this Agreement, Customer has delivered to Owner the certificate of registration in the form set forth as <u>Schedule 2</u>.  At all times during the Service Term, Customer shall ensure that Owner has an unexpired copy of such certificate of registration.

    5.3    <u>Terminal Access Agreement</u>.  Customer agrees that access to the Terminal by (i) marine tankers, barges, tank trucks and tank cars transporting Product for Customer or its designees to or from the Terminal or (ii) any other Person on behalf of Customer (both (i) and (ii) hereinafter referred to as an "**Accessing Party**") may, in the sole discretion of Owner, be conditioned upon prior execution of Owner's then-current form of access agreement used for the type of access being sought.

    5.4    <u>Agreement Regarding Inventory Management System Access</u>.  Customer agrees that access by any Person to any electronic inventory management system maintained by Owner or a Third Party for the Terminal may, in the sole discretion of Owner, be conditioned upon prior execution of an Agreement Regarding Inventory Management System Access and terms of use in the form set forth on <u>Schedule 3</u> between Owner and the Person accessing such system.

    5.5    <u>Marine Terms</u>.  In the event that the Services include receipts and/ or deliveries to and from Vessels, then the Howard Midstream Energy Partners, LLC Terms and Conditions for Marine Terminals set forth on <u>Schedule 4</u> are hereby incorporated into this Agreement by this reference.

[Remainder of Page Intentionally Left Blank]

This Agreement has been executed by the authorized representatives of each Party as indicated below effective as of the Effective Date.

Maverick Terminals Brownsville, LLC          Vanguard Energy, LLC

By: _____          By: _____

Name: _Rod Pullen_____          Name: _Matthew Klann_____

Title: _V.P. Business Development_          Title: _President_____

Date: _10/13/20_____          Date: _10-7-2020_____

6

Schedule 1

Howard Midstream Energy Partners, LLC
General Terms and Conditions for
Terminaling Agreements with Dedicated Tanks Service

Section 1.    DEFINITIONS.  Unless the context requires otherwise, the capitalized terms used in this Agreement have the meanings set forth in Part 1 or as indicated below.

"Accessing Party" has the meaning given in Part 1.

"Affiliate" means, in relation to a Party, any Person that (i) directly or indirectly controls such Party; (ii) is directly or indirectly controlled by such Party; or (iii) is directly or indirectly controlled by a Person that directly or indirectly controls such Party. For this purpose, "control" of any entity or Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of a majority of issued shares/units or voting power or control in fact of the entity or Person or otherwise.

"Agreement" means Part 1 and all of its attachments, schedules and exhibits, including these General Terms and Conditions.

"Applicable Law" means, with respect to any Person, (i) any law, treaty, constitution, statute, rule, regulation, act, code, ordinance, license, permit, order, writ, injunction, decision, directive, judgment, policy, decree, ruling of any Governmental Authority and any judicial or administrative interpretations thereof, (ii) any agreement, concession or arrangement with any other Governmental Authority and (iii) any license, permit or compliance requirement, in each case applicable to either Party or a Party's property or assets and as amended or modified from time to time.

"Bankrupt" means, with respect to either Party, that such Party (i) is dissolved, other than pursuant to a consolidation, amalgamation or merger, (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors, (iv) institutes a Proceeding or files a petition seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including a voluntary petition under chapter 7 or chapter 11 of the U.S. Bankruptcy Code, (v) has instituted against it a Proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, including an order for relief under the U.S. Bankruptcy Code, or a petition is presented for its winding-up or liquidation, including an involuntary petition under chapter 7 or chapter 11 of the U.S. Bankruptcy Code, and such Proceeding results in a judgment or is not dismissed or permanently stayed within sixty (60) calendar days of the filing of such Proceeding, (vi) has a resolution passed for its winding-up, official management or liquidation, other than pursuant to a consolidation, amalgamation or merger, (vii) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for all or substantially all of its assets, (viii) has one or more secured parties take possession of all or substantially all of its assets, or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all of its assets, (ix) files an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any Proceeding of the foregoing nature, or (x) takes any other action to authorize any of the foregoing actions.

"Barrel" means a volume equal to 42 U.S. Gallons.

"Business Day" means each calendar day, excluding Saturdays, Sundays, or other holidays observed by Owner as set forth in Part 1.

"Claim" means a dispute, claim or controversy whether based on contract, tort, strict liability, statute or other legal or equitable theory (including any claim of fraud, misrepresentation or fraudulent inducement or any question of validity or effect of an agreement).

"Commencement Date" has the meaning given in Part 1.

"Contract Year" means a period of twelve (12) consecutive Months beginning on the Commencement Date and ending on the day before the anniversary of the Commencement Date.

"**CPI-U**" means Consumer Price Index - All Urban Consumers for the Houston-Galveston-Brazoria, TX area (series ID CUURA318SA0) as published by the Bureau of Labor Statistics of the United States Department of Labor, or its closest successor.

"**Customer**" has the meaning ascribed thereto in Part 1

"**Customer's Product**" means Product owned or controlled by Customer or its Affiliates or over which it has the authority to manage on behalf of a Third Party owner.

"**Default**" or "**Event of Default**" has the meaning ascribed thereto in Section 15.1 of these General Terms and Conditions.

"**Defaulting Party**" has the meaning ascribed thereto in Section 15.2 of these General Terms and Conditions.

"**Effective Date**" has the meaning ascribed thereto in Part 1

"**First Service Term**" has the meaning given in Part 1

"**Force Majeure**" means any event or occurrence beyond the reasonable control of a Party that prevents in whole or in part the performance of any obligation or condition under this Agreement, including but not limited to strikes, lockouts, or other industrial disturbances, wars, sabotage, terrorism, cyberterrorism, blockades, insurrections, or acts of the public enemy, epidemics, landslides, lightning, earthquakes, tornadoes, loss of utilities, fires, explosions, storms, floods, washouts, or other acts of God, arrests or restraints of Governmental Authority and people, riots or civil disturbances, failures, disruptions, breakdowns, or accidents to machinery, facilities, or lines of pipe, (whether owned, leased or rented), freezing of lines, tanks or other equipment, embargoes, priorities, expropriation, or condemnation by any Governmental Authority; interference by any Governmental Authority; compliance with any orders, directives, rules or regulations issued by any Governmental Authority. Force Majeure will also include (i) any event described in the previous sentence and occurring with respect to the facilities or services of Owner's  or Customer's service providers providing a service or providing any equipment, goods, supplies, or other services or items necessary to the performance by Owner or Customer of its obligations under this Agreement, (ii) in those instances where Owner is required to obtain servitudes, rights-of-way, grants, surface rights, permits, or licenses to enable it to fulfill its obligations under this Agreement, Owner's inability to acquire, or delay in acquiring (at commercially reasonable cost and after the exercise of reasonable diligence) such servitudes, rights-of-way, grants, surface rights, permits, or licenses, (iii) in those instances where Owner is required to secure permits or permissions from any Governmental Authority to enable it to fulfill its obligations under this Agreement, Owner's inability to acquire, or delays on its part in acquiring (at commercially reasonable cost and after the exercise of reasonable diligence), such permits and permissions, and (iv) inspections, alterations, or repairs made necessary as a result of any event described in the previous sentence to any part of Owner's Facility or required relocations or modifications of tanks, pipelines, buildings, and other equipment comprising part of the Terminal, but, in each case, only to the extent the event is not within the reasonable control of Owner

"**Gallon**" means a U.S. gallon of 231 cubic inches corrected to 60°F in accordance with the latest supplement or amendment to ASTM-IP petroleum measurement tables

"**Good Industry Practice**" means the exercise of that degree of skill, care, diligence, prudence and foresight that would reasonably and ordinarily be expected from a skilled and experienced Product terminal operator engaged in the same type of undertaking under the same or similar circumstances

"**Governmental Authority**" means any foreign or U.S. federal, state, regional, local or municipal governmental body, agency, authority, instrumentality, board, bureau, court, central bank, commission, department, authority or entity established or controlled by a government or subdivision thereof, including any legislative, administrative, taxing, regulatory or judicial body, or any Person purporting to act for them.

"**Indemnified Party**" has the meaning given in Section 19.1 of these General Terms and Conditions

"**Indemnifying Party**" has the meaning given in Section 19.1 of these General Terms and Conditions

"**Independent Inspector**" means a Person licensed pursuant to Applicable Law mutually acceptable to both Parties who performs sampling, quality analysis and quantity determination of the Products received or delivered hereunder.

"**Interest Rate**" means the prime rate of interest for large U.S. Money Center Commercial Banks, published under "Money Rates" by "The Wall Street Journal plus one percent (1%).

"**Liabilities**" means any losses, charges, damages, fines, deficiencies, assessments, interests, penalties, costs and expenses of any kind related to or that arise out of this Agreement or any transactions hereunder (including reasonable attorneys' fees, other fees, court costs and other disbursements), including any such amounts that directly or indirectly arise out of or are related to any Claim, Proceeding, judgment, settlement or judicial or administrative order made or commenced by any Third Party or Governmental Authority related to or that arise out of this Agreement or any transaction hereunder.

"**Minimum Monthly Throughput Volume**" has the meaning given in Part 1.

"**Minimum Safe Level**" has the meaning given in Section 5.6 of these General Terms and Conditions.

"**Month**" means a calendar month.

"**Monthly Price Settlement**" has the meaning given in Section 10.3 of these General Terms and Conditions.

"**Operational Loss Allowances**" has the meaning given in Section 10.2 of these General Terms and Conditions.

"**Operational Loss Allowance Surplus**" means a volume (calculated separately for each different type of Stored Product) equal to the Operational Loss Allowances for that type of Stored Product for a specific period minus the actual Product Loss for that type of Stored Product during such period, provided that if such calculation yields a negative number, the volume shall be deemed to be zero (0).

"**Outage**" has the meaning given in Section 8.2 of these General Terms and Conditions.

"**Owner**" has the meaning given in Part 1.

"**Part 1**" means the first part of this Agreement that references these General Terms and Conditions.

"**Party**" and "**Parties**" has the meaning given in Part 1.

"**Performing Party**" has the meaning given in Section 15.2 of these General Terms and Conditions.

"**Person**" means any single or group of natural persons or any entity, including, without limitation, any corporation, partnership, trust or other legal entity.

"**Proceeding**" means any action, suit, Claim, investigation, review or other proceeding, at law or in equity, before any Governmental Authority, or before any arbitrator, board of arbitration or similar entity.

"**Product**" means the material that Customer stores in the Tanks, as set forth in Part 1 or as may be changed by agreement of Owner and Customer as described in these General Terms and Conditions.

"**Product Gains**" means the volume, if any, of Stored Product (calculated separately for each different type of Stored Product) at the end of a particular period that is in excess of (i) the volume of such Stored Product at the beginning of such period, plus (ii) the volume of any such Product with respect to which Customer has transferred custody to Owner pursuant to Section 6 of these General Terms and Conditions during such period, minus (iii) the volume of any of such Product with respect to which Owner has transferred custody to Customer pursuant to Section 6 of these General Terms and Conditions during such period.

"**Product Loss**" means the volume, if any, of Stored Product (calculated separately for each different type of Stored Product) at the end of a particular period that is less than (i) the volume of such Stored Product at the beginning of such period, plus (ii) the volume of any such Product with respect to which Customer has transferred custody to Owner pursuant to Section 6 of these General Terms and Conditions during such period, minus (iii) the volume of any such Product with respect to which Owner has transferred custody to Customer pursuant to Section 6 of these General Terms and Conditions during such period, minus (d) the volume of any Operational Loss Allowances during such period.

"**Product Loss Credit**" has the meaning given in Section 10.2 of these General Terms and Conditions.

"**Qualified Successor**" means a Third Party that (i) is the successor in interest of the assets and liabilities of Owner (including the Terminal) pursuant to a merger, stock or asset purchase, or similar transaction, or (ii) purchases the Terminal from Owner.

"**Receipt Notice**" has the meaning given in Section 4.2 of these General Terms and Conditions.

"**Renewal Service Term**" has the meaning given in Part 1.

"**Safe Fill Capacity**" means the maximum capacity of the relevant Tank for the Product being stored in such Tank as determined by Owner from time to time consistent with Good Industry Practice, which shall not be less than the working capacity as set forth in Part 1.

"**Shell Capacity**" means the maximum fill capacity of the tank measured in Barrels.

"**Service Term**" has the meaning given in Part 1.

"**Services**" has the meaning given in Part 1.

"**Stored Product**" means Customer's Product with respect to which Owner has custody at the Terminal pursuant to Section 6 of these General Terms and Conditions.

"**Tank**" means any of the storage tanks listed in Part 1 and "**Tanks**" means all of those storage tanks collectively.

"**Tank Blending Services**" means the mixing of one or more liquids in a Tank using mechanical mixing equipment.

"**Term**" means the period beginning on the Effective Date and ending at the expiration of the Service Term as described in Part 1.

"**Terminal**" means the real and personal property controlled by Owner where any Tank is located, including all facilities related thereto and references to a Terminal or Terminals will be deemed to include the Terminal manager thereof or his or her representative.

"**Third Party**" means any entity other than Owner, Customer or their respective Affiliates.

"**Third Party Claim**" has the meaning given in Section 19.3 of these General Terms and Conditions.

"**Throughput**" means the volume (as measured in Barrels) of Customer's Product with respect to which Customer has transferred custody to Owner pursuant to Section 6 of these General Terms and Conditions.

"**UCC**" has the meaning given in Section 2.2 of these General Terms and Conditions.

"**Vessel**" means an ocean-going tanker, barge or inland barge.

"**Volume Reconciliation**" has the meaning given in Section 10.2 of these General Terms and Conditions.

**Section 2.**   STATEMENTS, INVOICES, DOCUMENTS AND RECORDS

2.1   Subject to and conditional upon the performance by Customer of all of its obligations as and when provided in this Agreement, on or prior to 12:00 noon Central Time each Business Day, Owner will transmit to Customer a statement of receipts, deliveries, ending inventory, copies of individual Tank gauging documents and tank truck loading rack bills of lading, scale tickets and railroad and tank car gauging documents with respect to the preceding day(s). Such daily inventory data will be provided by Owner to Customer in such format as may be mutually agreed between the Parties. Such documents will be transmitted to Customer electronically (e-mail) and/or by facsimile per the contact information indicated in Part 1.

2.2   Subject to and conditional upon the performance by Customer of all of its obligations and as provided in this Agreement, Owner will provide Customer, on or prior to the fifteenth (15th) Business Day of each Month during the Service Term, at the address indicated in Part 1 hereto, statements reflecting the information below, with respect to the preceding Month:

(a)     beginning inventory balances of Stored Product;

(b)     the volume of Customer's Product received into the Terminal;

(c)     the volume of Product Loss, separately designating any such loss for which Owner is liable pursuant to Section 9 of these General Terms and Conditions;

(d)     the volume of Product Gains, and

(e)     the volume of Customer's Product delivered from the Terminal, other deliveries and ending inventory balances of Stored Product.

together with an invoice statement for all amounts due under Section 3 of these General Terms and Conditions for Services provided by Owner with respect to Customer's Product during the preceding Month, as applicable, all as set forth in Part 1.

To the extent required to perfect a statutory possession lien, each such statement will be considered a "warehouse receipt" under the Texas Uniform Commercial Code (the "UCC") and will include those items required under law for a warehouse receipt. In the event of any conflict between the documents provided to Customer under Section 2.1 of these General Terms and Conditions and the monthly statements provided under this Section 2.2 of these General Terms and Conditions, the monthly statements provided under this Section 2.2 of these General Terms and Conditions will control as to the volume of Customer's Product received and delivered by Owner, unless disputed by Customer within ninety (90) calendar days of the date of such monthly statement.

2.3     Each Party will maintain a true and correct set of records pertaining to its performance of this Agreement and will retain copies of all such records for a period of not less than two (2) years following termination or cancellation of this Agreement. Upon reasonable prior written notice and subject to the next sentence, a Party or its authorized representative may at its sole cost, during the Term of this Agreement and for the aforesaid two (2) year period, inspect such records of the other Party during normal business hours at the other Party's place of business. A Party may deny any request to inspect its records that the Party reasonably believes is not made in good faith. Unless a Party has taken written exception to a statement or invoice within two (2) years following the end of the year in which the statement or invoice is delivered, the statement or invoice shall be conclusively presumed to be true and correct. No Party shall be required to retain an invoice or statement that has become indisputable pursuant to the aforesaid conclusive presumption.

Section 3.     FEES, CHARGES AND TAXES

3.1     Customer will pay Owner, for Services provided under this Agreement, the fees and charges for Services provided by Owner with respect to Customer's Product as provided herein, in Part 1. In the event that the Commencement Date occurs on any day that is not the first day of a Month or the Service Term ends on any day that is not the last date of the Month, any minimum fees due under this Agreement for that Month shall be prorated.

3.2     All fees and charges reflected in Owner's invoices are due and payable within fifteen (15) Business Days of the date of receipt of Owner's invoice. Payment must be made by electronic wire transfer of same day available U.S funds to Owner's account and bank, both as indicated on Owner's invoice; provided, however, if Owner provides Customer with notice of a change of bank account information, then Customer shall not be obligated to make payment until it has independently verified the bank account information. Invoices may be sent by overnight courier, electronic mail, or facsimile. If Customer disputes any portion of an invoice, Customer must pay the undisputed portion of the invoice. Overdue amounts or disputed amounts that are resolved in favor of the Owner will accrue interest at the Interest Rate from the date that payment is due until paid in full. Customer agrees to reimburse Owner for all actual costs (including reasonable attorney's fees and court costs) incurred and paid by Owner with respect to the collection of past due amounts, including late payment charges, whether or not suit is brought.

3.3     Customer agrees to pay any and all taxes, fees or other charges and assessments, (including any charge or payment in lieu thereof), including ad valorem or property taxes applicable to Customer's Product, ownership taxes related to Customer's Product, and any applicable sales taxes on Services, Customer's Product and Customer's property at the Terminal. Customer will indemnify and reimburse Owner for all costs or expenses incurred and paid by Owner in association with the foregoing taxes, expenses, fees or costs. The Parties shall each be responsible for the payments of any fees, taxes, levies, or assessments imposed by any Governmental Authority, including federal and states income taxes, capital stock or franchise tax obligations, and any ad valorem, business or property.

3.4      The fees payable under this Agreement will be increased, effective on the first day after the end of the first Contract Year, and each Contract Year thereafter, from the fees for the previous Contract Year to reflect the percentage change in the CPI-U, calculated by comparing the CPI-U for the last Month ending two Months prior to the commencement of the Contract Year for which the fee escalation is being calculated with the CPI-U for the same month in the preceding calendar year.   For example, if the Contract Year for which the escalated fees are being calculated commences on April 1, 2018, the base Month for determining the escalation would be January 2017.   In this example, the fees would be escalated, effective April 1, 2018, based upon the percentage increase in the CPI-U between that published for January 2017 and that published for January 2018.  If the United States Government materially changes the manner of computing the CPI-U or ceases to publish the CPI-U at any time during the Term of this Agreement, the Parties will negotiate in good faith to agree upon a substitute index or methods of computing the index for purposes of escalating the fees under this Agreement using a method that is as similar as possible to the method set forth in this Section.

### Section 4.      OPERATIONS, RECEIPTS, AND DELIVERIES.

4.1      Receipts and deliveries of Customer's Product will be handled within the operating hours of the Terminal as set forth on Part 1.  Owner may make temporary changes in operating hours or temporarily close the Terminal without Customer's approval upon the occurrence of a Force Majeure.  Owner will promptly notify Customer in advance of such temporary changes or closure, or as soon after implementation as is practicable.

4.2      Customer's Product will be delivered to the Terminal via the modes described in Part 1 free of any charge to Owner.  Unless otherwise permitted by Owner in writing, within a reasonable period before the tentative arrival date(s) of any shipment of Customer's Product, Customer must provide notice to Owner and the Terminal in a form reasonably acceptable to Owner (in accordance with the notice provisions of Part 1) containing all necessary shipping instructions, including without limitation, the identity, quality and quantity of Customer's Product and/or the tentative pipeline receipt date(s) (the "**Receipt Notice**").  If Customer fails to provide Owner and the Terminal with such a Receipt Notice in the manner required by this Section 4.2, Owner will not be obligated to receive or deliver Customer's Product.  If Customer requires any change in the shipping instructions, including, without limitation, the identity of Customer's Product or the timing of the receipt of Customer's Product, Customer must provide notice of such change to the Receipt Notice (in accordance with the notice provisions of Part 1) to Owner and the Terminal within a reasonable period before the arrival of Customer's Product.   Upon receiving Customer's Receipt Notice or any subsequent change thereto, Owner will immediately advise Customer of the Terminal's availability.  If the Terminal will not be available to receive Customer's Product on the receipt date confirmed in the original or modified Receipt Notice, Owner will advise as to the earliest time when Customer's Product may be received at the Terminal.  Customer will ensure that confirmation of the receipt date(s) and time will be communicated to Owner and the Terminal during Owner's normal business operating hours. Notwithstanding the notice provisions of Part 1, any communications required by this Section 4.2 may be effected by telephone, facsimile or electronic mail directed to Owner's representatives and the Terminal manager.

4.3      Subject to and conditional upon the performance by Customer of all of its obligations as and when provided in this Agreement, Owner will deliver Stored Product to any Person as directed by Customer via the modes described in Part 1.  Customer's delivery directions must be received by Owner not less than twenty-four (24) hours prior to the requested delivery time.   If Customer provides such directions less than twenty-four (24) hours prior to the requested delivery time, Owner shall not be required to deliver Stored Product to Customer but shall use commercially reasonable efforts to do so.   Customer is responsible for providing to Owner all documentation required to authorize deliveries of Stored Product for or on its behalf from the Terminal.

4.4      The Services to be provided by Owner pursuant to this Agreement are to be provided only with respect to Customer's Product and will be provided with respect to other products only following Owner's prior written consent, which consent will be withheld in Owner's sole discretion.

4.5      Where Customer requests such service in writing or such services are required due to a change in Product type, during the Service Term of this Agreement, Customer shall reimburse Owner for all costs and expenses incurred by Owner, plus a ten percent (10%) handling fee, in (i) cleaning Tanks and pipelines used by Owner to store and transport Customer's Product (on a pro-rata basis if the pipelines are utilized for other Terminal customers' products), which shall only occur at the termination of this Agreement, and (ii) removing and disposing of unmerchantable solids and liquids which are not recovered as Product at termination of this Agreement.

4.6      Upon the expiration or termination of this Agreement, Customer shall have fifteen (15) days to remove all Product from the Terminal without additional charge, but Customer will remain obligated to comply with the terms of this Agreement until all Product is removed and Customer will pay, in lieu of any other terminaling or throughput fee, a holdover charge of $0.03 per Barrel per day of the Shell Capacity of the Tanks in which any Product remaining in the

Terminal is stored until all of Customer's Product is removed.  If Customer fails to remove all Product from the Terminal within fifteen (15) days of the expiration or termination of this Agreement, Owner may sell such Product on any terms that are commercially reasonable.  Owner may withhold from the proceeds of the sale an amount necessary to satisfy any amounts due under this Agreement and any costs incurred in connection with the sale.  After all of Customer's Product has been removed from the Terminal, Customer shall reimburse Owner for all costs incurred by Owner, plus a ten percent (10%) handling fee, in (i) cleaning Tanks and pipelines (on a pro-rata basis if the pipelines are utilized for other Terminal customers' products) used by Owner to store and transport Customer's Product, (ii) removing and disposing of unmerchantable solids and liquids which are not recovered as Product, (iii) removing and handling of all Tank bottoms (if Customer is not able to transfer title to such Tank bottoms to the next customer of the Tank) and (iv) taking any other reasonable actions necessary, in all cases to make the Tanks and pipelines suitable for the handling and storage of ultra-low sulfur diesel fuel.

4.7     If any change in Applicable Laws requires any modification, alteration or addition or installation of any improvement to any equipment at the Terminal or otherwise materially interferes with, changes the nature of, or increases the costs of the Services Owner is required to provide under this Agreement, Owner will notify Customer of the impact of such change on the fees charged by Owner pursuant to this Agreement.  Within ten (10) Business Days of receipt of Owner's notice, Customer must notify Owner whether it will pay such fees as modified.  If Customer elects not to pay such modified fees, Owner may, within thirty (30) days of the receipt of Customer's notice delivered in accordance with the preceding sentence, elect to terminate this Agreement in whole or in part as required, in Owner's sole discretion, to comply with or avoid the increased costs imposed by compliance with the change in Applicable Law, provided that if Owner does not so terminate, Owner shall continue to provide the Services impacted by the change in Applicable Laws without any increase in fees payable by Customer.

**Section 5.**     *PRODUCT QUALITY STANDARDS AND REQUIREMENTS.*

5.1     Customer warrants to Owner that all Product tendered by or for the account of Customer for receipt by the Terminal will conform to the specifications for such Product set forth in Part 1 and will comply with Good Industry Practice and all Applicable Law.  Owner will not be obligated to receive or accept Product into the Terminal that fails to meet the required quality specifications set forth in Part 1.  Owner may rely upon the analysis of the Independent Inspector as well as the specifications and representations of Customer set forth in the Receipt Notice as to Product quality.  Should Owner remove and dispose of any water or other material in or associated with Stored Product at any time, Customer shall reimburse Owner for reasonable actual costs and expenses incurred with respect to such removal and disposal, plus a ten percent (10%) service fee.

5.2     The quality of Product tendered into the Terminal for Customer's account must be verified either by Customer's laboratory analysis, or by an Independent Inspector's analysis indicating that the Product so tendered meets Owner's Product specifications set forth in Part 1.  Such analysis shall be conducted on a periodic basis in accordance with a quality compliance program implemented by Customer, which program shall be subject to the approval of Owner, which approval shall not be unreasonably withheld.  All costs associated with such compliance program shall be borne by Customer.  Upon reasonable notice to Customer, Owner, at its expense, may sample any Stored Product for the purpose of confirming the accuracy of the analysis.

5.3     Owner will endeavor to maintain Customer's Product in the Tanks, but reserves the right to store Customer's Product in another tank if Owner's operation of the Terminal should dictate otherwise; provided, however, Customer shall not be liable for any additional costs related to the substitution of Tanks.  Prior to the time of each receipt of Product from Customer, Customer shall deliver, or cause to be delivered, to Owner a certificate setting forth the quality, grade and other specifications of the Product; provided that Customer shall utilize its best efforts to provide such certificate to Owner at least twenty-four (24) hours prior to such receipt.

5.4     Applicable Law imposes limitations on the Reid Vapor Pressure (RVP) of gasoline during certain times of the year.  In order to ensure that all Product being delivered out of the Terminal complies with these limitations, Owner may be required to limit the deliver by Customer of higher RVP gasoline into the Terminal during certain periods.  Owner will provide notification of the dates on which such higher RVP gasoline may and may not be delivered to the Terminal and will endeavor to provide such notices with sufficient advance notice to allow Customer to appropriately plan its gasoline supply.  Notwithstanding these efforts by Owner and Customer, at times, it may be necessary for Owner to take additional steps to ensure that Product delivered out of the Terminal complies with Applicable Laws.  Customer hereby authorizes Owner to use whatever means it deems necessary to comply with such limitations, including downgrading gasoline to a lesser grade (e.g., premium gasoline downgraded to regular gasoline) or the sale of gasoline to a Third Party.  Owner will use reasonable efforts to minimize the impact of these actions on Customer's Product and will advise

Customer of the impact of such activities on Customer's Product, but will have no liability to Customer for the impact of these activities on Customer's Product.

5.5     Each Party may at all reasonable times make appropriate tests to determine whether Customer's Product stored or delivered meets the specifications for such Product set forth in Part 1.  Owner shall not be liable to Customer for any Liabilities incurred by Customer in the event that Customer or Customer's agent delivers Product into the Terminal that does not meet the required quality specifications for the Product, and Customer agrees to indemnify Owner for any Liabilities related to the delivery by Customer or Customer's agent of Product that does not meet the required quality specifications for the Product.  Any failure to meet specifications claimed by Owner must be confirmed by an independent inspector's analysis, which shall be paid for by Customer only if such failure is confirmed.

5.6     Customer agrees to maintain the level of Stored Product in each Tank at the level that Owner reasonably deems necessary, in accordance with Good Industry Practice for the safe operation of the Terminal and Tanks (including the right to lock down Tanks) (the "**Minimum Safe Level**"), which levels are set forth in Part 1.  Following reasonable written pre-notification to Customer, Owner, at its reasonable discretion, may add water to any Tank in the event the level of Stored Product is insufficient to achieve the required safety levels of Product in such Tank.  If water is added due to insufficient levels of Stored Product, such water shall be removed by Owner at Customer's expense.

5.7     In the event that Customer desires to change the type of Product or the specifications for the Product being stored in a Tank, Customer may ask Owner to permit such change, and if Owner agrees to swing Tanks (change of service) at Customer's request, Customer shall reimburse Owner for all costs associated therewith.  Typical costs associated with such changes of service may include, but are not limited to, those costs incurred when draining and cleaning Tanks and associated piping, performing piping and system modifications necessary to maintain and provide normal facility and load rack operations, as well as modifications to Terminal automation systems necessitated by such changes.  Owner will provide, if requested by Customer, a reasonable estimate of costs prior to a requested change of service.  In no case shall the estimate be binding on Owner, and Customer shall reimburse Owner for all actual expenses incurred.

5.8     All fixtures, equipment and appurtenances attached to the Tanks, pipelines and other facilities of the Terminal by either Party are and will remain the property of Owner.  No such items may be installed by Customer without Owner's prior written consent, which consent may be withheld in Owner's sole discretion.

Section 6.     TITLE AND CUSTODY OF PRODUCT.

6.1     Title to Customer's Product will remain with Customer at all times, subject to any lien in favor of Owner created pursuant to the terms of this Agreement or under Applicable Law.

6.2     If Product is received by Owner at the Terminal by pipeline, custody of Customer's Product shall pass to Owner at the point at which such Product leaves the pipeline owner's piping and enters any piping owned by Owner.  If Stored Product is delivered to Customer by pipeline, custody of such Product shall pass from Owner to Customer at the point at which the Product leaves any piping owned by Owner and enters the pipeline owner's piping.

6.3     If Product is received by Owner at the Terminal by truck or rail, custody of Customer's Product shall pass to Owner at the point at which such Product passes the Owner's first permanent flange connection between Customer's transportation carrier and Owner's unloading assembly.  If Stored Product is delivered to Customer by truck or rail, custody of such Product shall pass from Owner to Customer at the point at which the Product passes the Owner's last permanent flange connection between Owner's loading assembly and Customer's transportation carrier.

6.4     If Product is received by Owner at the Terminal by Vessel, custody of Customer's Product shall pass to Owner in accordance with Schedule 4 to the Agreement.

Section 7.     LIMITATION OF LIABILITY AND DAMAGES.

7.1     Owner shall have no responsibility for any Liabilities arising out of possession or use of the Product after transfer of custody of Customer's Product to Customer as provided in Section 6 of these General Terms and Conditions.

7.2     The maximum liability of Owner for Product Loss will not exceed, and is strictly limited to, the market value of the Product at the time of the Product Loss or immediately prior to its contamination, plus the costs and expenses actually, reasonably and necessarily incurred by Customer, plus any fines and penalties actually levied against and paid by Customer by reason of such Product Loss.

8

7.3    EXCEPT WITH RESPECT TO THIRD PARTY CLAIMS, THE PARTIES' LIABILITY FOR DAMAGES HEREUNDER IS LIMITED TO DIRECT, ACTUAL DAMAGES ONLY AND NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR SPECIFIC PERFORMANCE, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, OR SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, IN TORT, CONTRACT OR OTHERWISE, OF ANY KIND, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PERFORMANCE, THE SUSPENSION OF PERFORMANCE, THE FAILURE TO PERFORM, OR THE TERMINATION OF THIS AGREEMENT.  EACH PARTY ACKNOWLEDGES ITS DUTY TO MITIGATE DAMAGES HEREUNDER.

Section 8.    MAINTENANCE.

8.1    Owner may remove Tanks and associated Terminal equipment from service during the Service Term in order to comply with Good Industry Practice or Applicable Laws for maintenance items including, but not limited to, cleaning of Tanks and associated pipelines (i) due to a permitted change in the nature of the Product to be handled pursuant to Section 5.7 of these General Terms and Conditions, and (ii) in connection with the removal of a Tank from service in order for Owner to perform a maintenance inspection and repair of one of the Tanks as required by 49 C.F.R. 195.432(b) or API 653.  Owner shall provide Customer with a substitute tank during the maintenance period.  If Owner does not provide Customer with a substitute tank, then Customer's fees, costs and charges hereunder shall be pro-rated for the period of time the Tank is out of service.

8.2    In the event of any such maintenance or shutdown of the Tanks or the Terminal (other than due to a Force Majeure event) that may impact Customer's Throughput of Product hereunder (an "**Outage**"), Owner shall provide Customer with at least ten (10) days advance notice of the Outage  if such Outage is a planned Outage or otherwise scheduled, or as much advance notice as reasonably possible if the Outage is unplanned.  In no event shall Owner schedule a planned Outage without first consulting with Customer and using reasonable efforts to accommodate scheduling requests made by Customer.

Section 9.    PRODUCT MEASUREMENT.

9.1    Subject to subsection (c) below, quantities of Customer's Product received into and delivered from the Terminal shall be determined as follows:

(a)    For pipeline receipts, volumes shall be measured by custody transfer meters.  Owner will be responsible for installing and operating measurement facilities on Owner's pipeline. All volumes shall be temperature corrected in accordance with the latest supplement or amendment to API/ASTM petroleum measurement tables and Applicable Law.

(b)    For rail car deliveries, volumes shall be measured by the following methods in order of priority: (i) calibrated meters, (ii) static terminal tank gauges or calibrated scales, as applicable. All volumes shall be temperature corrected in accordance with the latest supplement or amendment to API/ASTM petroleum measurement tables and Applicable Law.

(c)    Absent fraud or manifest error, the quantities of Stored Product at any time will be determined from Terminal inventory records of receipts and deliveries.  Unless indicated otherwise, quantity determinations will be based on a Barrel of Product and shall be determined in accordance with the latest established API/ASTM standards for the method of delivery and Applicable Law.  All volumes shall be temperature corrected in accordance with the latest supplement or amendment to API/ASTM petroleum measurement tables or other applicable correction tables under Applicable Law.  Gauging of Product received, delivered and in storage will be taken jointly by representatives of the Parties; provided, however, that if Customer does not have representatives present for gauging, then pipeline meter tickets, or, where pipeline meter tickets are not available, Owner's gauging, will be conclusive, absent fraud or manifest error.  Customer may use an independent inspector at its own expense at any time.

9.2    Terminal meters and scales (if applicable) will be calibrated periodically and upon each completion of repair or replacement of a meter or scale, at the meter or scale owner's expense. Owner shall provide Customer with copies of meter proving, tank calibrations, and other certifications of measurement equipment as soon as practicable after equipment that is used in connection with the Services provided pursuant to this Agreement is certified or maintenance on such equipment is performed.  The scheduled dates and times of such calibrations shall be as set forth in a schedule delivered to Customer and Customer shall have the right to witness such procedures at its own expense.  Failure to so witness shall not be deemed a waiver of any right or claim by Customer.  Such calibration shall be in accordance with the latest applicable state and county standards (and Applicable Law) including applicable API/ASTM standards to the extent

adopted by and incorporated in the applicable state and county standards. If a meter or scale or shore tank is determined by either Party to be defective or inoperative or out of calibration, such Party shall immediately notify the other Party, and it will be the responsibility of the Owner to promptly make repairs or replacements or calibration. Product received or delivered through a facility having an inoperative or defective meter will be measured based upon before and after static Tank gauges and any active Tanks measured in accordance with Section 9.1 of these General Terms and Conditions. In such event the Parties shall appoint a mutually acceptable Independent Inspector to gauge the applicable Tanks and the findings of the Independent Inspector shall be final and binding on the Parties, except for fraud or manifest error. The Parties shall share equally the cost of the Independent Inspector under this Section 9.2.

Section 10. PRODUCT DAMAGES AND LOSSES.

10.1 Except as set forth in Section 10.2 of these General Terms and Conditions, Customer will retain risk of loss of the Product at all times while Owner has custody of the Product.

10.2 Except for losses or damage caused by or contributed to by the actions of Customer, or Customer's employees, agents, authorized representatives, or invitees (to the extent of such losses or damage), and those set forth in 9.2(a) through (h) below, Owner shall be liable to Customer for all Product Loss, including damage or loss caused by fire, leakage, contamination or any similar cause which occurs while Owner has custody of such Product, provided however, that Owner shall not be liable for any of the following (the "**Operational Loss Allowances**"), which shall be for Customer's account:

(a) an allowance for losses of Customer's Product handled hereunder caused by normal handling and evaporation losses of one half of one percent (0.50%) of the quantity of Customer's Product received at the Terminal for Customer's account during such calendar year.

(b) an allowance for losses of ethanol handled hereunder caused by normal handling and evaporation losses of one half of one percent (0.5%) of the quantity of ethanol received at the Terminal for Customer's account during such calendar year.

(c) [Intentionally deleted];

(d) any losses or shortages associated with circumstances involving Force Majeure;

(e) [Intentionally deleted]

(f) any losses or shortages caused by landing Tank roofs or changing Tank lineups or services as requested by Customer; and

(g) any losses or shortages of any such Products during such calendar year to the extent resulting from casualties not caused or contributed to by the negligence or willful misconduct of Owner, Owner's other customers, or Third Parties, or their agents, servants or employees.

As soon as reasonably possible after the end of each calendar month during the Service Term of this Agreement, *but not later than thirty (30) days after the end of such Month*, Owner shall deliver to Customer an accounting (the "**Volume Reconciliation**") detailing, for the Month just ended, the information required by Section 2.2 of these General Terms and Conditions. The Volume Reconciliation shall reflect, for each Month just ended, the volume of Product Loss or Product Gain during such Month for each different type of Product. All Product Gains and Product Losses for each Month shall be balanced against each other on a Product-specific basis to arrive at net volume differential for each type of Product for the Month. The Customer's closing inventory for one year shall be the Customer's opening inventory for the following year.

Owner shall reflect in the Volume Reconciliation the volume, if any, of Product Gains or Operational Loss Allowance Surplus for each specific type of Stored Product for the Month. The value of any volume of Product Gains or Operational Loss Allowance Surplus, as determined pursuant to Section 10.3 of these General Terms and Conditions, shall be a "**Product Loss Credit**". Owner shall be entitled to offset any liability for Product Loss during the Service Term by the amount of any Product Loss Credit not previously used by Owner to offset liability for Product Loss.

In the event that there is a net Product Loss for a specific Product for the Month, Owner shall reflect in the Volume Reconciliation the volume of the Product Loss attributable to Operational Loss Allowances. The value of any volume of Product Loss in excess of the Operational Loss Allowance, as determined pursuant to Section 10.3 of these General

10

Terms and Conditions, minus the value of any Product Loss Credits not previously used by Owner to offset liability for Product Loss, shall be reflected as a credit on the invoice delivered pursuant to Section 3.2 of these General Terms and Conditions immediately following the Volume Reconciliation. In the event that this Agreement is terminated at a time other than the close of a Month, Owner shall be liable for quantities of Product Loss on a pro-rated basis for such fractional Month, computed in accordance with the provisions hereof, minus the value of any Product Loss Credits not previously used by Owner to offset liability for Product Loss. Owner shall account to Customer as soon after the termination of this Agreement as is reasonably possible.

The foregoing notwithstanding, Owner shall not have any obligation to insure Customer's Product. Owner shall not be liable to Customer as an insurer of Customer's Products and, except by way of subrogation, Owner shall not be liable to Customer for Product Losses for which Customer is compensated by its insurer. Owner's liability under this Section 10 shall be limited to payment for, or replacement of, lost or damaged Product, as set forth hereunder, and shall not include consequential damages, including but not limited to, loss of revenues or loss of business, nor for punitive or exemplary damages.

10.3   For the purposes of determining values in Section 10.2 of these General Terms and Conditions, the value of each Barrel of Product shall be an amount equal to the sum of (i) the average of the Monthly Price Settlement for each Month during the relevant period, plus (ii) reasonable transportation costs to the Terminal as determined by Owner in its sole but reasonable discretion. The "**Monthly Price Settlement**" shall be the average during the applicable Month of the daily Platt's US Marketscan "Gulf Coast Pipeline" mean price for the applicable, or most closely applicable, product classification.

Section 11.   FORCE MAJEURE.

If a Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement (other than the obligation to make payments of monies due hereunder), then such Party shall give prompt written notice of the Force Majeure to the other Party stating facts supporting such claim of inability to perform. Thereupon, the obligation to perform so affected shall be suspended during the continuation of an inability so caused, but for no longer period, and this Agreement shall otherwise remain unaffected. The Party shall use due diligence to remove the cause, where commercially practicable, with all reasonable dispatch, provided, however, that this provision shall not require the settlement of strikes, lockouts, or other labor difficulty if such course is determined inadvisable by Owner. If a Party is rendered unable to perform by reason of an event of Force Majeure for a period in excess of one Month, then either Party may terminate this Agreement upon written notice to the other Party.

Section 12.   AUDIT, INSPECTION OF AND ACCESS TO TERMINAL.

12.1   Subject to and conditional upon the performance by Customer of all of its obligations as and when provided in this Agreement, Customer shall have the right during Owner's normal working hours and after written notice to Owner and the Terminal delivered no sooner than ten (10) calendar days before the time of such action so as not to disrupt the Terminal's or Owner's operation to:

(a)   Make periodic operational inspections of the Terminal;

(b)   Conduct physical verifications of the amount of Customer's Stored Product; and

(c)   Witness Owner's scheduled meter provings/certifications.

Customer's right and that of its authorized representatives to enter the Terminal will be exercised by Customer in a way that will not interfere with or diminish Owner's control over or its operation of the Terminal and will be subject to all commercially reasonable rules and regulations promulgated by Owner, including without limitation Owner's safety and training requirements and Owner's requirements with respect to execution by any accessing Person of Owner's then-current terminal access agreement, pursuant to Section 5.3 of Part 1 of this Agreement.

12.2   Customer will have the right, upon ten (10) days prior written notice, to review for compliance with the terms of the Agreement, (i) the movement of Customer's Products into, through, and out of the Terminal, (ii) the relevant portion of all books, records, and information kept by or on behalf of Owner that reasonably relate to Customer's rights and obligations under the Agreement, and (iii) any other fees and/or costs charged by Owner or any of its Affiliates, representatives or contractors pursuant to the Agreement, including, without limitation, matters that require the direct reimbursement by Customer. Owner will retain all such books and records related to the charges to Customer for Services provided under this Agreement for a period of two (2) years from the date of termination or cancellation of this

11

Agreement. Customer may audit such books and records at Owner's principal office or the Terminal. Any such audit will be at Customer's expense and will take place during normal business hours at the audit location.

12.3    Customer acknowledges that any grant by Owner of the right of access to the Terminal to Customer or any of Customer's agents under this Agreement or under any document related to this Agreement is a grant of a license only and shall convey no interest in or to the Terminal or any part thereof to Customer or any of Customer's agents.

### Section 13.    ASSIGNMENT.

13.1    This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of each Party. Except as otherwise expressly set forth in this Agreement, neither Party shall transfer, hypothecate, pledge, encumber, mortgage, or assign this Agreement or its rights or interests hereunder, in whole or in part, or delegate its obligations hereunder, in whole or in part, without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed, unless such transfer or assignment is to an Affiliate or, in the case of Owner, to a Qualified Successor and such assignment would not materially impair the Services to be provided under this Agreement, in which case no consent shall be required (but in which case the Party assigning this Agreement shall give notice to the other Party). For purposes of this Section 13.1, a change in the majority ownership or control of Customer from that in effect as of the Effective Date (whether in one transaction or a series of transactions) shall be deemed to be an assignment.

13.2    Notwithstanding the foregoing, Owner or its successors and assigns of their respective interests hereunder may assign the rights and obligations under this Agreement as collateral to any lenders in connection with any financing or refinancing related to the Terminal.

13.3    Any attempt to assign, hypothecate, pledge, encumber or mortgage this Agreement by either Party in violation of this Section 13 shall be null and void. The consent by Owner to any assignment, hypothecation, pledge, encumbrance, or mortgage of this Agreement at the request of Customer shall not constitute a waiver of Owner's right to withhold its consent to any other or further assignment, hypothecation, pledge, encumbrance or mortgage of this Agreement. The absolute and unconditional prohibitions contained in this Section 13 and Customer's agreement to them are material inducements to Owner to enter into this Agreement and any breach thereof will constitute an Event of Default under Subsection 15.2 of these General Terms and Conditions permitting Owner to exercise all remedies provided for in this Agreement or by Applicable Law.

### Section 14.    COMPLIANCE WITH LAW AND SAFETY.

14.1    Customer warrants that the Product has been produced, transported, and handled, and Owner warrants that the Services provided by it under this Agreement are, in full compliance with all Applicable Law. Each Party also warrants that it may lawfully receive and handle such Product, and it will furnish to the other Party any evidence required to provide compliance with Applicable Law and to file with applicable Governmental Authorities reports evidencing such compliance.

14.2    Customer agrees that in order to have access to the Terminal, all railcars, trucks or other transportation equipment used by Customer, and not provided for Customer's use by Owner, in connection with this Agreement will comply with Applicable Law, as well as Owner's safety rules and operating practices. Customer will furnish Owner with information (including Material Safety Data Sheets) concerning the safety and health aspects of Product stored or delivered to the Terminal under this Agreement. Owner will communicate such information to all persons who may be exposed to or may handle such Product, including without limitation, Owner's employees, agents and contractors.

14.3    Upon Owner's receipt of notice from any Governmental Authority of any material violation of any Applicable Law or the commencement of any Proceeding against Owner for any material violation of any Applicable Law which would materially interfere with Owner's ability to perform its obligations hereunder, Owner shall promptly provide written notice to Customer setting forth the details thereof.

### Section 15.    DEFAULT, WAIVER AND REMEDIES.

15.1    Default or Event of Default. Notwithstanding any other provision of this Agreement, the occurrence of any of the following events shall constitute a "**Default**" or "**Event of Default**" hereunder:

(a)    Failure to Pay. Either Party fails to make payment when due hereunder within five (5) Business Days of a written demand therefor, subject to Section 3.2 of these General Terms and Conditions.

(b)     Misrepresentation.  Any representation or warranty contained herein shall prove untrue in any material respect on or as of the date it was made or was deemed to have been made.

(c)     Failure to Perform.  Either Party fails to perform any material obligation or breaches any covenant made to the other Party hereunder (other than the Defaults enumerated in Section 15.1(a), Section 15.1(d), or Section 15.1(f) of these General Terms and Conditions), which, if capable of being cured, is not cured to the satisfaction of the other Party (in its sole discretion) within five (5) Business Days from the date that such Party receives notice that corrective action is needed.

(d)     Bankruptcy.  Either Party becomes Bankrupt.

(e)     Repudiation.  Either Party shall repudiate, deny or disaffirm its obligations hereunder or shall cancel, terminate, revoke or rescind this Agreement without the express prior consent of the other Party.

(f)     Unpermitted Assignment.  Either Party shall assign or attempt to assign this Agreement in violation of Section 13 of these General Terms and Conditions; or

(g)     Challenge to Enforceability

(i)     Any Proceeding shall have been commenced by any Person (other than by either Party) seeking to cancel, revoke, rescind or disaffirm the obligations of any Party to this Agreement (unless such Party is contesting the Proceeding in good faith and such Proceeding is withdrawn or dismissed with prejudice within forty-five (45) calendar days);

(ii)     Any court or other Governmental Authority shall issue a judgment, order, decree or ruling to the effect that any of the material obligations of any Party to this Agreement is illegal, invalid or unenforceable in accordance with its terms; or

(iii)     Any claim or lien (other than Owner's statutory landlord/bailee lien or lien hereunder, or any statutory liens for taxes not yet due) is asserted or placed on any portion of Stored Product.

15.2    Remedies Upon a Default or Event of Default.  Notwithstanding any other provision of this Agreement, upon the occurrence and during the continuance of a Default or Event of Default with respect to a Party (the "**Defaulting Party**"), the other Party (the "**Performing Party**") may, in its sole discretion, in addition to all other remedies available to it and without incurring any Liabilities to the Defaulting Party or to Third Parties (for demurrage or any other costs arising from delay or otherwise), may do any one or more of the following:

(a)     withhold or suspend its performance and obligations hereunder without prior notice to the Defaulting Party;

(b)     proceed against the Defaulting Party for damages occasioned by the Defaulting Party's failure to perform; and

(c)     upon one (1) Business Day's prior notice to the Defaulting Party, immediately terminate this Agreement and settle all amounts due between the Parties in accordance with this Agreement.

Notwithstanding the foregoing, in the case of a Default or Event of Default described in Section 15.1(d) of these General Terms and Conditions, no prior notice shall be required.

15.3    Non-Exclusive Remedy.  The Performing Party may enforce any of its remedies hereunder. The Performing Party's rights under this Section 15 shall be in addition to, and not in limitation or exclusion of, any other rights of setoff, recoupment, combination of accounts, lien or other right which it may have, whether by agreement, operation of law or otherwise. No delay or failure on the part of a Performing Party to exercise any right or remedy shall constitute an abandonment or waiver of such right or remedy and the Performing Party shall be entitled to exercise such right or remedy at any time after a Default or Event of Default has occurred.

15.4    Costs and Expenses.  A Party shall reimburse the other Party for its costs and expenses, including reasonable attorneys' fees, incurred in connection with the other Party's enforcement of, suing for or collecting any amounts payable by it hereunder after entry of a final, non-appealable order.  To the extent practicable, the Performing

13

Party shall notify the Defaulting Party of all amounts owed under this Section 15 within 30 days of the termination of this Agreement

Section 16.    INSURANCE.

16.1    Insurance Required by Both Parties   Throughout the Service Term of this Agreement, each Party and its agents shall, at such Party's sole expense, carry and maintain in full force and effect insurance coverages, with insurance companies rated not less than A-, or otherwise reasonably satisfactory to the other Party, of the following types and amounts.

(a)    Workers Compensation coverage in compliance with the Applicable Law of the states having jurisdiction over each employee and employer's liability coverage in a minimum amount of one million dollars ($1,000,000) per accident, one million dollars ($1,000,000) disease per employee and one million dollars ($1,000,000) disease policy limit.

(b)    Automobile liability coverage in a minimum amount of one million dollars ($1,000,000).

(c)    Comprehensive or commercial general liability coverage and umbrella excess liability coverage excess of the insurance required in Section 16.1(a) through (c) of these General Terms and Conditions, in a minimum amount of five million dollars ($5,000,000), which includes bodily injury, property damage and contractual liability coverages.

(d)    If Customer's employees enter the Terminal or perform any activity near the Terminal for any reason under this Agreement, employer's liability coverage in a minimum amount of one million dollars ($1,000,000) (combined single limit) for each accident, including occupational disease coverage with a limit of one hundred thousand dollars ($100,000) for each employee and a one million dollar ($1,000,000) policy limit.

16.2    Insurance Required by Owner   In addition to the insurance required pursuant to Section 16.1 of these General Terms and Conditions, Owner shall provide comprehensive or commercial general liability coverage and umbrella excess liability coverage in a minimum amount of ten million dollars ($10,000,000), which includes Product Loss and "sudden and accidental pollution" liability coverages (excluding events that result in acidic deposition).

16.3    Additional Insurance Requirements

(a)    Each Party shall cause its insurance carriers to furnish to the other Party insurance certificates, in a form reasonably satisfactory to the other Party, evidencing the existence of the coverages required pursuant to Sections 16.1 and 16.2 of these General Terms and Conditions   Renewal certificates shall be provided within ten (10) days of expiration of the previous policy under which coverage is maintained

(b)    The foregoing policies shall include an endorsement that the underwriters agree to waive all rights of subrogation to the extent of each Party's obligations.   Further, each Party shall be named as an additional insured under the other Party's policies, to the extent of the indemnities required under this Agreement.

(c)    The mere purchase and existence of insurance coverage shall not reduce or release either Party from any Liabilities incurred or assumed under this Agreement

(d)    In the event of a Product Loss for which Owner must indemnify Customer under this Agreement, Owner's insurance shall be the primary and exclusive coverage for such loss, notwithstanding the existence of other valid and collectible insurance

Section 17.    LIEN AND SECURITY INTEREST.

To secure any and all charges or fees to which Owner is entitled or will become entitled pursuant to this Agreement or any other agreement between Owner and Customer and in addition to any lien that Owner may claim under Applicable Law, Customer hereby grants to Owner an irrevocable first and preferred lien upon and a security interest in the Product, subject to and in accordance with Article 9 of the UCC.   Such security interest shall (i) attach to the Proceeds (as such term is defined in the UCC) of the Product and (ii) cover obligations of Customer and amounts that are or may become due to Owner   The Owner is hereby authorized by the Customer to file any financing statement or other instrument necessary or desirable to Owner with respect to such security interest   In the event of a Default by Customer, Owner may proceed in accordance with Applicable Law, including, without limitation, Article 9 of the UCC, to enforce its

14

lien, including, without limitation, by selling Product in any commercially reasonable manner, to satisfy all contractual and statutory obligations of Customer under this Agreement, including without limitation, all costs, reasonable attorney fees, and expenses incurred by Owner in the enforcement of its lien and the recovery of fees owed to Owner by Customer.

**Section 18.  CREDIT TERMS.**

Customer shall provide Owner with such financial information as Owner reasonably may request from time to time to permit Owner to evaluate Customer's financial condition. If at any time Owner believes in good faith that the financial condition of the Customer has been impaired or is unsatisfactory, Owner may request and Customer shall promptly provide to Owner advance cash payment, in an amount equal to the value of all anticipated storage fees, and other fees and obligations of Customer that may arise out of this Agreement. If the current value of the Stored Product is at any time less than the value of the security demanded by Owner and not provided by Customer, Owner may refuse to deliver to Customer any additional Product until such time as the value of Customer's Stored Product and any advance cash payment provided by Customer exceeds such security demanded by Owner. The exercise by Owner of any rights under this section is without prejudice to any other rights of Owner including any claim for damages.

**Section 19.  INDEMNIFICATION.**

19.1  <u>Duty to Indemnify</u>. Each Party (the "**Indemnifying Party**") shall indemnify, defend and hold the other Party, its Affiliates, and their employees, directors, officers, managers, shareholders, members, representatives, agents and contractors (collectively, the "**Indemnified Party**") harmless from and against any and all Liabilities arising from the Indemnifying Party's (i) breach of this Agreement or of Applicable Law, (ii) gross negligence or willful misconduct, or (iii) failure to comply with Applicable Law with respect to the sale, transportation, storage, handling or disposal of the Product, unless and to such extent that such liability results from the Indemnified Party's gross negligence or willful misconduct. For clarity purposes, the Parties agree that Customer will indemnify and hold harmless the Owner (including its Affiliates, employees, directors, officers, managers, representatives, agents and contractors) from and against any and all Liabilities arising from a determination from or a claim by a Governmental Authority that the Stored Product came from illicit sources.

19.2  <u>No Third Party Rights</u>. The Parties' obligations to defend, indemnify and hold each other harmless under the terms of this Agreement shall not vest any rights in any Third Party, whether a Governmental Authority or private entity, nor shall they be considered an admission of liability or responsibility for any purposes other than those enumerated in this Agreement. The terms of this Agreement are enforceable only by the Parties.

19.3  <u>Third Party Claims</u>. The Indemnified Party shall notify the Indemnifying Party as soon as practicable after receiving notice of any Claim or Proceeding brought against it by a third party that might give rise to an indemnity claim under this Agreement (a "**Third Party Claim**") and shall furnish to the Indemnifying Party the complete details within its knowledge. Any delay or failure by the Indemnified Party to give notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations except to the extent, if any, that the Indemnifying Party shall have been materially prejudiced by reason of such delay or failure.

19.4  <u>Claim Procedure</u>. The Indemnifying Party shall have the right to assume the defense, at its own expense and by its own counsel, of any Third Party Claim, provided, however, that such counsel is reasonably acceptable to the Indemnified Party. However, in the event (i) the Indemnifying Party shall not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the initiation of such Third Party Claim, or (ii) the interests of the Indemnifying Party, whether or not a named party in such Proceeding, and those of the Indemnified Party are or could reasonably be expected by the Indemnified Party to be adverse, then the Indemnified Party may assume its own defense and the Indemnifying Party shall reimburse the Indemnified Party on a current basis for its reasonable expenses of investigation, reasonable attorney's fees and expense and reasonable out-of-pocket expenses incurred in the defense thereof.

Notwithstanding the Indemnifying Party's appointment of counsel to represent an Indemnified Party, the Indemnified Party, in addition, at its expense, shall have the right to employ separate counsel reasonably acceptable to the Indemnifying Party to participate in the defense of such Claim. In such event, the Indemnifying Party shall cause its counsel to permit counsel to the Indemnified Party to participate in the defense of the Claim.

If requested by the Indemnifying Party, the Indemnified Party agrees to reasonably cooperate with the Indemnifying Party and its counsel in contesting any Claim or Proceeding that the Indemnifying Party defends, including, if appropriate, making any counterclaim or cross-complaint. All reasonably incurred costs and expenses incurred in connection with the Indemnified Party's cooperation shall be borne by the Indemnifying Party.

19.5    Settlement.  No Third Party Claim may be settled or compromised by the Indemnified Party without the consent of the Indemnifying Party, or by the Indemnifying Party without the consent of the Indemnified Party. Notwithstanding the foregoing, an Indemnifying Party shall not be entitled to assume responsibility for and control of any Proceeding if such Proceeding involves a Default or Event of Default by the Indemnifying Party hereunder which shall have occurred and be continuing.

Section 20.     CONSTRUCTION OF AGREEMENT.

20.1    Headings.  The headings of the sections and subsections of this Agreement are for convenience only and shall not be used in the interpretation of this Agreement.

20.2    Amendment or Waiver.  This Agreement may not be amended, modified or waived except by written instrument executed by officers or duly authorized representatives of the respective Parties.

20.3    Severability.  Any provision of this Agreement that is prohibited or not enforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of the prohibition or lack of enforceability without invalidating the remaining provisions of this Agreement, or affect the validity or enforceability of those provisions in another jurisdiction or the validity or enforceability of this Agreement as a whole.

20.4    Successors and Assigns and No Third-Party Beneficiaries.  This Agreement is for the exclusive benefit of the Parties and no other Person or entity will have any right or Claim against any Party under any of the terms of it or be entitled to enforce any of the terms and provisions of it against any Party. This Agreement shall be binding on the Parties and their respective successors and permitted assigns.

20.5    Entire Agreement and Conflict with Attachments.  This Agreement (including Attachments) contains the entire and exclusive agreement between the Parties with respect to the subject matter hereof, and there are no other promises, representations, or warranties affecting it. The terms of this Agreement may not be contradicted, explained or supplanted by any usage of trade, course of dealing or course of performance and any other representation, promise, statement or warranty made by either Party or their agents that differs in any way from the terms contained herein will be given no force or effect. In the case of any conflict between the body of this Agreement and any of its Attachments, those contained in the Attachments will govern.

20.6    Counterparts, Facsimile Signatures.  This Agreement may be executed by the Parties in separate counterparts and all such counterparts shall together constitute one and the same instrument. In the event that any signature is delivered by facsimile transmission or as a PDF, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf the signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

20.7    Survival.  The provisions of these General Terms and Conditions shall survive the expiration or termination of this Agreement. Section 7, Section 10, Section 17, Section 18, Section 19, Section 20, and Section 21; and Subsections 2.3, 3.3, 4.7, 15.2, and 15.4.

Section 21.     LAW.

21.1    CHOICE OF LAW.  THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY, CONSTRUED IN ACCORDANCE WITH AND ENFORCED UNDER THE LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAWS PROVISIONS.

21.2    JURISDICTION.  EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY STATE COURT LOCATED IN HARRIS COUNTY, TEXAS (WITHOUT RECOURSE TO ARBITRATION UNLESS BOTH PARTIES AGREE IN WRITING), AND TO SERVICE OF PROCESS BY CERTIFIED MAIL, DELIVERED TO THE PARTY AT THE MOST RECENT DESIGNATED ADDRESS.  EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION TO PERSONAL JURISDICTION, WHETHER ON GROUNDS OF VENUE, RESIDENCE OR DOMICILE.

21.3    WAIVER OF JURY TRIAL.  EACH PARTY FURTHER WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT.

21.4   <u>TIME PERIOD FOR MAKING CLAIMS</u>   EXCEPT WHEN A SHORTER PERIOD IS EXPRESSLY PROVIDED HEREUNDER, ANY CLAIM  OTHER THAN THIRD PARTY CLAIMS, ARISING HEREUNDER SHALL BE DEEMED WAIVED AND BARRED WITHOUT RECOURSE TO LITIGATION UNLESS SUCH CLAIM IS MADE PRIOR TO TWO (2) YEARS FROM THE DATE OF THE EVENTS GIVING RISE TO THE CLAIM

21.5   <u>RECOUPMENT</u>   NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN THE PARTIES. EVERY LIABILITY OF OWNER TO CUSTOMER IS SUBJECT TO AND CONDITIONED UPON THE RECOUPMENT OF ANY LIABILITY OF CUSTOMER OWING TO OWNER  SO AS TO ESTABLISH A NET LIABILITY OF ONE PARTY TO THE OTHER   CUSTOMER ACKNOWLEDGES AND AGREES THAT THE AMOUNT AND EXTENT OF EVERY LIABILITY AND OBLIGATION OF OWNER TO CUSTOMER HAS BEEN AGREED, BASED AND CALCULATED UPON, AND SUBJECT AND CONDITIONAL UPON. RECOUPMENT OF EVERY LIABILITY OF CUSTOMER TO OWNER REDUCING EACH SUCH LIABILITY OR OBLIGATION OF OWNER

[END]



**Department of the Treasury**
*Internal Revenue Service*
**Small Business/Self Employed Division**
**Excise Tax**
7850 S.W. 6th Court
MS4400
Plantation, FL 33324

Vanguard Energy LLC
Attn: Matthew Klann
999 Ponce de Leon, Ste 510
Coral Gables, FL 33134

Date:
08/04/2020
Taxpayer ID number:
84-3488633
Contact person:
Patricia Garcia
Contact employee ID number:
07-05314
Contact number:
(954) 991-4150
(888) 895-4955
Registration number:
2020-000341-S
Effective date of registration:
7/30/2020

### Approval of Excise Tax Registration

Dear Mr. Klann:

We approved your Form 637, Application for Registration (For Certain Excise Tax Activities), under Internal Revenue Code Section 4101 . The effective date and your registration number are above.

We registered you for the following activities:

The "S" activity in your registration number signifies an enterer, position holder, refiner, terminal operator, or throughputter of gasoline, diesel fuel (including a diesel-water fuel emulsion), or kerosene, or industrial user of gasoline.

The enclosed Publication 5039, Terms and Conditions of Registration for Form 637, explains what you must do to keep your registration in good standing.

If you have questions, you can call the contact person shown above.

Sincerely,

*Daryl Gilliam*

Daryl Gilliam for Karen Lewallen Sumter
Chief, Estate, Gift, & Excise Tax Program

Enclosure:
Publication 5039

Letter 3689 (Rev. 5-2019)
Catalog Number 36285V

Schedule 2

## NOTIFICATION CERTIFICATE OF TAXABLE FUEL REGISTRANT

VANGUARD Energy LLC   999 Ponce de leon, ste 510   Coral Gables
FL 33134
Name, address and employer identification number of person receiving certificate

The undersigned taxable fuel registrant ("Registrant") hereby certifies under penalties of perjury that Registrant is registered by the Internal Revenue Service with registration number 2020 · and that Registrant's registration has not been revoked or suspended by the Internal Revenue Service DC341-5

Registrant understands that the fraudulent use of this certificate may subject Registrant and all parties making such fraudulent use of this certificate to a fine or imprisonment, or both, together with the cost of prosecution.

_Matthew Klein_
Signature and date signed

Matthew Klein
Printed or typed name of person signing

President
Title of person signing

VANGuard Energy LLC
Name of registrant

84-3488633
Employer identification number

999 Ponce de leon, ste 510, Coral Gables, FL 33134
Address of registrant

1

Schedule 3

## AGREEMENT REGARDING INVENTORY MANAGEMENT SYSTEM
## ACCESS AND TERMS OF USE

The undersigned is a representative of _VANGuard Energy LLC_ (the "User")
who is duly authorized to execute this agreement and bind the User to the terms and conditions set
forth herein.  User has requested the right to access an inventory management system (the
"**System**") maintained by Howard Midstream Energy Partners, LLC or one of its affiliates (the
"**Owner**").  The System is intended to provide User access to information regarding the inventory of
petroleum products located at Owner's terminal in Port Arthur, Texas and receipts and deliveries of
those petroleum products to and from such terminal.  In order to induce Owner to provide access to
the System for User, User hereby agrees that the terms and conditions set forth in Exhibit A shall
apply to User's access to the System and that User shall comply with such terms and conditions at
all times.

[Company], a [State] [entity]

By: _Matthew Klann_

Name: _Matthew Klann_

Title: _President_

1

EXHIBIT A

INVENTORY MANAGEMENT SYSTEM ACCESS TERMS OF USE

1    **Access Agreement**  By accessing the System, you are accepting and agree to be bound by the terms and conditions set forth in this terms of use (the "Terms of Use"). If you do not agree with these Terms of Use, do not access the inventory management system and immediately notify Owner.

2    **Connectivity of System Services**  Owner may provide you with access to the inventory management system, use commercially reasonable efforts to maintain high speed connectivity to the terminal automation software and hardware provider, (the "TAP") and to use commercially reasonable efforts to maintain the inventory management system (together the **System Services**) without interruption; provided that nothing in these Terms of Use shall be interpreted to require Owner to do so. You acknowledge that Owner is not responsible for interruptions, inaccuracies or operational issues with the System Services. You understand that the System Services are formatted according to Owner's existing hardware, software and/or data communications equipment and may not be compatible with or suitable for your current or future hardware, software, or other technological infrastructure. Likewise, the System Services may not be compatible with or suitable for use with the current or future hardware, software, or other technological infrastructure of the TAP. Owner shall determine in its sole discretion, the information that is sent, including any specific codes, from the Terminal to the TAP. You shall be solely responsible for working with the TAP to translate any such information or codes or implement any unique data handling it may require.

3    **Data Security**  By utilizing the System Services, you acknowledge and agree you are prohibited from violating or attempting to violate security for, or otherwise interfering with, the operation of the System Services at any time. Although Owner attempts to ensure the integrity and security of the System Services, Owner cannot guarantee that Owner's security measures will prevent unauthorized parties from accessing information through the TAP or the System Services. Owner is not responsible for any breach of security or for the actions of any third parties that may obtain any information from the System Services.

4    **Disclosure of Information**  By using the System Services, you acknowledge and agree that Owner may disclose your confidential information without your consent to satisfy laws or government regulations, comply with any legal process or law enforcement requests, commence legal actions to protect Owner's rights or property, or to investigate, prevent, or take action regarding illegal activities, suspected fraud, situations involving potential threats to the physical safety of any person, or violations of these Terms of Use. When commercially reasonable, Owner will disclose only the information reasonably required under the circumstances and will provide you with reasonable notice of such requirement with a reasonable opportunity to object to such disclosure. You acknowledge that by using the System Services you may obtain access to sensitive, proprietary or confidential information for which you are not the intended recipient or which relate to the activities or product inventories of other parties. You specifically agree to keep any such information strictly confidential and not to use such information for any purpose.

5    **Upgrade and Maintenance Obligations**  Owner is providing the System Services as a courtesy at your request and is under no obligation to incur any costs to provide the System Services. Owner provides the System Services herein based on current performance standards and specifications consistent with Owner's standard terminal automation systems. No additional modifications or processes shall be provided by Owner in connection with the System Services provided under these Terms of Use. Owner shall not be required to upgrade or enhance its hardware, software, or other systems for any reason, including to comply with changes or modifications affecting the System Services by the TAP, even where such upgrades are required in order to allow you to access or utilize all or any part of the System Services. Owner shall not be responsible for your limited ability or inability to use all or part of the System Services. You shall be solely and exclusively responsible for any and all modifications or upgrades required to ensure your operative use of the System Services and for all hardware, software, systems, scheduling, and support necessary to utilize the System Services. Owner shall in no way, be responsible for

2

operation or maintenance of the System Services and shall not be liable for the fault, failure, or data integrity of the System Services.

6.    **Termination**.  Owner may terminate the System Services at any time by providing notice to you.  Notwithstanding any termination, your obligations under these Terms of Use will survive any termination of the System Services or of these Terms of Use.

7.    **Indemnification**.  By utilizing the System Services, you agree to release, indemnify, defend, and hold harmless Owner and its affiliates and their shareholders, directors, officers, employees and agents ("Owner Indemnitees") from and against any and all claims, demands, causes of action, damages, losses, liens, suits, judgments, fines, penalties, awards, costs, liabilities and expenses (including without limitation reasonable attorneys' fees) of any nature, kind, or description, arising out of or related to the System Services (together the "Claims") except for (i) Claims arising from Owner's alleged violation of intellectual property related to the System Services, and (ii) Claims resulting from Owner's negligence or willful misconduct.  You specifically agree to release, indemnify, defend, and hold harmless Owner Indemnitees from all Claims related to your alleged *infringement of intellectual property relating to the System Services.*

8.    **Disclaimer of Warranties**.  EXCEPT AS EXPRESSLY PROVIDED HEREIN, OWNER DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, IN FACT OR BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE SYSTEM SERVICES, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  OWNER *SPECIFICALLY DISCLAIMS* ALL RESPONSIBILITY FOR SERVICES PROVIDED BY THE TAP.

9.    **Governing Law**.  These Terms of Use will be governed by and construed in accordance with the laws of the State of Texas, without reference to the choice of law principles thereof.  Any disputes arising out of this Agreement will be subject to the exclusive jurisdiction of the courts of the State of Texas located in Harris County, Texas and the United States federal courts in the Southern District of Texas.  EACH PARTY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR

PROCEEDING RELATING TO THIS AGREEMENT.

10.    **Modification, Waiver, Severability**.  Owner may update or modify these Terms of Use by written notice to you.  No delay or omission by the Owner in exercising any right under these Terms of Use shall operate as a waiver of that or any other right.  A waiver or consent given by the Owner on any one occasion shall be effective only in that instance and shall not be construed as a bar or waiver of any right on any other occasion.  In the event that any provision of these Terms of Use shall be held invalid, illegal or otherwise unenforceable, the validity, legality, and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

<u>Schedule 4</u>

Howard Midstream Energy Partners, LLC Terms and Conditions for Marine Terminals

See attached.

1